MARY SHEARER, APPELLANT, V. DONALD S. LEUENBERGER, INDIVIDUALLY AND IN HIS CAPACITY AS THE DIRECTOR OF THE NEBRASKA DEPARTMENT OF SOCIAL SERVICES, ET AL., APPELLEES.

591 N.W. 2d 762

Filed April 2, 1999.    No. S-97-852.

Brett McArthur for appellant.

Don Stenberg, Attorney General, Royce N. Harper, and Michael J. Rumbaugh, Special Assistant Attorney General, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

The appellant, Mary Shearer, was charged with child neglect after her 4-year-old son, J.S., disobeyed her instruction not to play in the cab of a pickup truck parked in her driveway. The

child apparently moved the gearshift, allowing the truck to roll down the driveway and strike a parked car. The criminal charges against Shearer were dismissed, but the case was still investigated by Jodine Allen, an investigator with the then Nebraska Department of Social Services (DSS). Shearer, on the advice of her attorney, refused to allow Allen to interview Shearer or Shearer's children, and Allen, basing her conclusion solely on the police report of the incident, identified Shearer as a potential child abuser in the Abused or Neglected Child Registry (Registry) maintained by DSS. Shearer sued the appellees in the instant action, Allen and Donald Leuenberger, the director of DSS, in their individual and official capacities, and DSS itself. After the district court entered an injunction against DSS, Shearer's name was permanently expunged from the Registry. Shearer maintained her suit, seeking damages for emotional distress and loss of reputation allegedly resulting from violations of her constitutional rights. The district court entered judgment in favor of the appellees and dismissed Shearer's suit. The initial question presented in this case is whether Shearer's action is barred by sovereign immunity. For the reasons that follow, we conclude that Shearer's action is barred by sovereign immunity, and we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

On June 28, 1995, Shearer's child C.S., then 5 years old, went outside to play. C.S. had asked Shearer if he and some neighbor children could play in a pickup truck that was parked outside. The truck belonged to Shearer's boyfriend and was parked in the driveway of the Shearer residence. Shearer told C.S. that he was not allowed to play in the cab of the truck, but that he and his friends could play in the bed of the truck.

Nonetheless, a few minutes later, C.S. came back into the house and reported that the truck had "rolled out of the driveway and hit [a parked] car" belonging to a friend of Shearer's who was visiting at the time. C.S.'s brother J.S., then 4 years old, had climbed into the cab of the truck and played with the gearshift, evidently shifting the truck out of gear so that it rolled down the driveway. J.S. had been in the cab of the truck, while C.S. and at least three neighbor children had been in the bed of

the truck at the time. One child reportedly struck her head, but no serious injuries were reported. There was minor damage to the car, but no one at the Shearer residence called the police.

The police nevertheless appeared about 20 minutes later, apparently having been called by a neighbor, and Shearer was cited for misdemeanor child abuse and neglect for leaving children unattended in a vehicle. The criminal charges were ultimately dismissed on October 11, 1995.

On August 21, 1995, Shearer was contacted by Allen, a caseworker with DSS. Allen stopped at the Shearer residence and finding no one home, left a note for Shearer asking her to contact Allen. Shearer did not do so, and on August 31, Allen contacted Shearer by telephone. Allen explained to Shearer that Allen's duty was to follow up on the police report, and Shearer told Allen that Shearer would not speak with Allen, on advice of counsel, and that Allen should contact Shearer's attorney.

Allen called Shearer's attorney the same day and explained that she wanted to meet with Shearer and her children; Shearer's attorney asked a few questions and said that he would talk to Shearer. Allen did not hear from Shearer or her attorney, so Allen called Shearer's attorney again on September 28, 1995. Shearer's attorney told Allen to send a list of specific questions that she wanted to ask Shearer. Allen explained that she did not typically ask a specific set of questions, but she did send Shearer's attorney DSS' "Child At Risk Field" risk assessment tool.

At the same time Allen sent the risk assessment form to Shearer's attorney, Allen also asked that an interview between Allen and Shearer be scheduled by a certain date, but Allen received no response to this request. On November 8, 1995, Allen again contacted Shearer and informed her that although the criminal case had been dismissed, DSS' investigation had not been completed. Shearer again said that she needed to speak with her attorney.

On November 21, 1995, Allen sent a letter to both Shearer and her attorney, stating that unless Shearer was willing to be interviewed, Allen would close the investigation on December 4. Allen wrote that her conclusion would be based on the police report of the incident, because, without interviewing Shearer,

that would be the only evidence Allen had. Allen further indicated, in essence, that the police report, standing alone, would substantiate the charge of child neglect.

On December 4, 1995, not having met with Shearer or her attorney, Allen closed the investigation. Allen then sent Shearer a letter informing her that her name had been entered into DSS' "Central Registry" for reported child abuse and neglect. The report relating to Shearer was categorized as "inconclusive," meaning that the investigation indicated "by a preponderance of the evidence that maltreatment has occurred." The letter also informed Shearer of the procedures available if she wanted her name removed from the Registry. The letter, however, was sent by certified mail, and Shearer did not pick up the letter.

Shearer nonetheless discovered in late December that her name had been placed in the Registry. Shearer said that she was "devastated" by this discovery and was "humiliated, depressed, angry, just stressed."

Shearer sued in the district court, seeking an injunction directing DSS to remove her name from the Registry. Shearer also sought damages from DSS and Leuenberger and Allen, in both their individual and official capacities. Shearer's petition alleged two "causes of action," the first based on alleged violation of her right to remain silent under Nebraska law and the 5th Amendment to the U.S. Constitution and the second based on violation of her rights under the Due Process Clause of the 14th Amendment to the U.S. Constitution. Shearer alleged damages in the form of attorney fees, emotional distress, loss of enjoyment of life, and harm to her reputation.

The district court entered a temporary injunction preventing DSS from having Shearer's name in the Registry. The appellees asked the district court to reconsider, alleging, as they had in their answer to Shearer's petition, that the court lacked jurisdiction by virtue of the appellees' sovereign immunity.

Both Shearer and the appellees subsequently filed motions for summary judgment. The district court overruled Shearer's motion for summary judgment entirely and partially overruled the appellees' motion for summary judgment. The district court dismissed Shearer's first cause of action, relating to her right to remain silent, finding that the first cause of action alleged a tort

and that Shearer's noncompliance with the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1994), was fatal to her claim. Shearer does not argue the first cause of action on appeal.

The district court also dismissed the "portion of [Shearer's] action that seeks a Declaratory Judgment against the State," but did not dismiss the action in that regard as against the individual appellees. Finally, the district court dissolved the temporary injunction against DSS, by agreement of the parties, as the removal of Shearer's name from the Registry had mooted the issue.

The matter proceeded to trial on the second cause of action, the issue being whether Shearer could demonstrate that she had been damaged by DSS' actions. Prior to trial, Shearer asked the court for a jury trial, but this was denied, based on the district court's finding that the remaining cause of action was pled in equity. The case was tried to the court, and the district court found that since Shearer could demonstrate no damage to her reputation, she had not established the violation of a liberty interest protected by the Due Process Clause and that judgment should therefore be entered in favor of the appellees. Shearer timely appealed to the Nebraska Court of Appeals, and we removed the case to our docket on our own motion.

The record also reveals that Shearer filed motions for attorney fees on May 12 and July 24, 1997, and that DSS filed a responsive motion for attorney fees and costs on August 5. The record does not reveal, however, how these claims were resolved by the district court.

## II. ASSIGNMENTS OF ERROR

Shearer alleges that the district court erred in (1) overruling her motion for summary judgment, (2) denying her a trial by jury, (3) finding that she had not met her burden of proof as to the material elements of the case, and (4) denying her motion for attorney fees and costs.

## III. SCOPE OF REVIEW

When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent

conclusion irrespective of the decision of the court below. *Galyen v. Balka*, 253 Neb. 270, 570 N.W.2d 519 (1997).

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent from the lower court's decision. *Charles Vrana & Son Constr. v. State*, 255 Neb. 845, 587 N.W.2d 543 (1998); *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998).

## IV. ANALYSIS

We note that Shearer's first assignment of error is an appeal from a pretrial denial of her motion for summary judgment. Shearer does not assign as error, however, the district court's entry of summary judgment with reference to her first cause of action, and her appellate brief makes clear that she is claiming error only regarding the denial of summary judgment on her due process claim.

The denial of a summary judgment motion is neither appealable nor reviewable, except where adverse parties have each moved for summary judgment and the trial court has sustained one of the motions. *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). In the present case, this exception does not apply, because summary judgment was granted only as to Shearer's first cause of action and she does not claim this as error on appeal. Instead, she claims error regarding the denial of summary judgment on her second cause of action, relating to due process. Because this matter proceeded to trial on that cause of action, there is no applicable exception to the rule that the denial of a summary judgment is not reviewable on appeal, and we do not consider Shearer's assignment of error. See *id.*

Before addressing Shearer's remaining assignments of error, we must resolve two preliminary issues: We must determine precisely what Shearer has claimed, and we must consider the appellees' contention that all of Shearer's claims are barred by sovereign immunity.

Shearer's pleadings in the district court are, to put it kindly, rather difficult to decipher. Shearer identifies who she believes violated her rights and what rights she believes were violated, but the statutes under which she is claiming relief are unidenti-

fied. Shearer does not state whether her claims are predicated on state or federal law. We are reluctant to accept Shearer's apparent invitation to wander through the Nebraska Revised Statutes and U.S. Code seeking a statute under which her petition might be construed to state a claim. At oral argument, however, Shearer's counsel indicated that Shearer's claim is based on 42 U.S.C. § 1983 (1994). In accordance with the liberal pleading requirements for a federal civil rights action, we will so construe Shearer's petition.

## 1. NEBRASKA LAW

Before addressing federal law, we must consider two state statutory provisions: the statutes establishing the Registry, Neb. Rev. Stat. §§ 28-715 and 28-718 et seq. (Reissue 1995), and the special child abuse immunity provision of Neb. Rev. Stat. § 28-716 (Reissue 1995).

### (a) Registry

DSS is directed by § 28-715 to "file each report of suspected abuse or neglect in a special state Abused or Neglected Child Registry to be maintained in the department." It is further provided by § 28-720 that all cases should be classified in one of these categories: "(1) Court substantiated; (2) petition to be filed; (3) investigation inconclusive; or (4) unfounded report, whichever the case may be." It is stated in § 28-720 that "information identifying the subjects of unfounded reports shall be expunged from the register forthwith." Shearer's case was initially classified "inconclusive," but has since been expunged.

According to §§ 28-722 and 28-726, access to information from cases of any classification is strictly limited to persons whose access is authorized by statute, such as subjects of the reports themselves; parents, guardians, or guardians ad litem of subjects; law enforcement agencies investigating a report of abuse or neglect; county attorneys preparing an abuse, neglect, or termination petition; a physician treating a child whom he or she reasonably believes may have been abused or neglected; an agency having legal responsibility for the welfare of an abused or neglected child; the State Foster Care Review Board, when the records relate to a child placed for foster care; and certain government agencies responsible for the protection of disabled

and mentally ill subjects. Access is also provided by § 28-726 to persons engaged in research or auditing, but under those circumstances requires the removal of any information that would identify any subjects of the reports. The statutes do not provide for dissemination of Registry information to potential employers or the public at large. There is no evidence in the record indicating that information from Shearer's case was released to anyone.

It is provided by Neb. Rev. Stat. § 28-713.01 (Reissue 1995) that when DSS completes an investigation, it shall notify the subject of the report regarding DSS' determination of the case. It is further established, in § 28-723, that any subject may, after the completion of an investigation, ask DSS to amend or expunge the report from the Registry and that if DSS does not do so within 30 days, the subject has the right to a fair hearing within DSS, at which the burden is on DSS to sustain the accuracy of the report. The statute also provides that DSS' decision may be appealed under the Administrative Procedure Act. The record in this case does not indicate that Shearer availed herself of this remedy.

### (b) Child Abuse Immunity Statute

The appellees defended in the district court on the basis of § 28-716 and direct our attention to the statute, which states in pertinent part: "Any person participating in an investigation or the making of a report pursuant to the provisions of sections 28-710 to 28-717 . . . shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed, except for maliciously false statements."

It is clear that the investigation of Shearer and the placement of her name in the Registry were conducted pursuant to the provisions of Neb. Rev. Stat. §§ 28-710 through 28-717 (Reissue 1995). Shearer does not allege, nor does the record reveal, any "maliciously false statements" by the appellees. Therefore, by the plain language of this statute, Leuenberger and Allen, in their individual capacities, are immune from liability under state law.

Although Shearer does not expressly challenge the constitutionality of § 28-716, we note that the U.S. Supreme Court has

specifically approved a similar statute from California which granted public employees immunity from liability resulting from determinations of whether to parole or release prisoners from the California penal system. See *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980). We also note that other jurisdictions have held statutes similar to § 28-716 to be valid and enforceable. See, e.g., *Lux by Lux v. Hansen*, 886 F.2d 1064 (8th Cir. 1989); *B.W. v. Meade County*, 534 N.W.2d 595 (S.D. 1995); *Elmore v. Van Horn*, 844 P.2d 1078 (Wyo. 1992); *Dept. of Health and Rehab. v. Dougherty*, 700 So. 2d 77 (Fla. App. 1997), *review denied* 717 So. 2d 530 (Fla. 1998); *Davis v. Durham City Schools*, 91 N.C. App. 520, 372 S.E.2d 318 (1988); *Storch v. Silverman*, 186 Cal. App. 3d 671, 231 Cal. Rptr. 27 (1986).

## 2. FEDERAL LAW

In relevant part, 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Although the states have concurrent jurisdiction to entertain § 1983 actions, as a result of the Supremacy Clause found in U.S. Const. art. VI, federal law is controlling and preempts any conflicting state law in determining these claims. *Gordon v. Community First State Bank*, 255 Neb. 637, 587 N.W.2d 343 (1998). Because Shearer's civil rights claim is advanced under federal law, she need not comply with the procedural requirements of the State Tort Claims Act. See, *Felder v. Casey*, 487 U.S. 131, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988) (holding that Wisconsin's state tort notice-of-claim statute could not defeat § 1983 action filed in state court). Compare *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995) (holding that failure to file notice of claim to Commission of Industrial Relations did not defeat § 1983 action filed in state court).

Under federal law, only two factual allegations are necessary to state a cause of action under § 1983: (1) a defendant's deprivation of a plaintiff's right secured by the Constitution and laws of the United States and (2) that the deprivation occurred under color of law. *Wichman v. Naylor*, 241 Neb. 249, 487 N.W.2d 291 (1992) (citing *Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991); *Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972); *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Cooper v. Pate*, 378 U.S. 546, 84 S. Ct. 1733, 12 L. Ed. 2d 1030 (1964)). See, also, *Gordon v. Community First State Bank, supra.* Shearer's petition meets the liberal pleading standard for § 1983.

Contrary to the appellees' contention, the immunity from liability under state law provided by § 28-716 does not apply to a claim advanced under federal law, even if that claim is litigated in a Nebraska court. The U.S. Supreme Court has held that

> "[c]onduct by persons acting under color of state law which is wrongful under 42 U. S. C. § 1983 or § 1985 (3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. . . ."

*Martinez v. California*, 444 U.S. at 284 n.8.

### (a) Sovereign Immunity for State Appellees

We first consider whether § 1983 abrogates traditional sovereign immunity for states and state officials. In this regard, the U.S. Supreme Court has specifically held that

> a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself. . . .

> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.

(Citations omitted.) *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). See, also, *Howlett v. Rose*, 496 U.S. 356, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990).

Given the foregoing authority and finding no waiver of the State's immunity that is properly applied in this case, we determine that Shearer cannot bring a § 1983 action against DSS or against Leuenberger and Allen in their official capacities.

### (b) Qualified Immunity for Individual Appellees

The district court ultimately decided that Shearer had failed to establish a violation of due process because she failed to sufficiently prove that she had been damaged by the appellees' conduct. Before we reach that issue, however, we must first consider whether Allen and Leuenberger in their individual capacities are immune from liability under § 1983.

Under § 1983, public officials sued in their individual capacity " 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Davis v. Scherer*, 468 U.S. 183, 191, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Whether an official may prevail in his or her qualified immunity defense depends upon the " 'objective reasonableness of [his or her] conduct as measured by reference to clearly established law.' " *Id.*

> In order to determine whether a defendant is entitled to qualified immunity, we engage in a two-part analysis. . . . First, we must determine whether the plaintiff has alleged the violation of a constitutional right. . . . Second, we must determine whether that right was clearly established at the time of the alleged violation.

(Citations omitted.) *Manzano v. South Dakota Dept. of Social Services*, 60 F.3d 505, 509 (8th Cir. 1995).

As noted above, Shearer's petition, when liberally construed, alleges the violation of a constitutional right. Hence, our analysis turns to whether or not that right was "clearly established" at the time of the alleged violation.

> For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." . . . "This is not to say an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

(Citation omitted.) *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

The U.S. Court of Appeals for the Eighth Circuit, in the context of a child abuse investigation, has noted that

an imperfect investigation without more does not deprive the investigators of qualified immunity. . . . ("The question is whether the state of the law was such that a reasonable person would have known [his or her] actions were unconstitutional. Furthermore, a reasonable person is not expected to act as a legal scholar and predict the future direction of the law. Closely analogous cases, decided before the defendant acted . . . are often required to find that a constitutional or statutory right is clearly established.")

*Myers v. Morris,* 810 F.2d 1437, 1460 (8th Cir. 1987), *cert. denied* 484 U.S. 828, 108 S. Ct. 97, 98 L. Ed. 2d 58, *abrogated on other grounds, Burns v. Reed,* 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991).

In a series of cases, the Eighth Circuit has held that parental liberty interests are not clearly established in the context of reasonable suspicion of child abuse, even where that suspicion results in the wrongful placement of the children into foster care. See, e.g., *Thomason v. SCAN Volunteer Services, Inc.,* 85 F.3d 1365 (8th Cir. 1996); *Manzano v. South Dakota Dept. of Social Services, supra; Lux by Lux v. Hansen,* 886 F.2d 1064 (8th Cir. 1989); *Doe v. Hennepin County,* 858 F.2d 1325 (8th Cir. 1988), *cert. denied* 490 U.S. 1108, 109 S. Ct. 3161, 104 L. Ed. 2d 1023 (1989); *Myers v. Morris, supra.*

We also note that several other jurisdictions have confronted due process challenges to child abuse registry schemes similar to that established in Nebraska. Appellate courts that have confronted similar facts to those in the instant case have generally found that those circumstances comport with due process. See, e.g., *Watso v. Dept. of Social Services,* 841 P.2d 299 (Colo. 1992); *Roth v. Reagen,* 422 N.W.2d 464 (Iowa 1988); *Mary L. v. State Dept. of Social Services,* 244 A.D.2d 133, 676 N.Y.S.2d 704 (1998); *Physical Abuse at Blackacre Acad.,* 304 N.J. Super.

168, 698 A.2d 1275 (1997); *J.P. v. Carter*, 24 Va. App. 707, 485 S.E.2d 162 (1997); *Johnston v. Michael Shea and Associates*, 425 N.W.2d 263 (Minn. App. 1988).

Those appellate courts that have found child abuse registry systems to violate due process have done so on facts that are distinguishable from those found in the Nebraska scheme and in the present case. See, e.g., *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994); *Lee TT. v. Dowling*, 87 N.Y.2d 699, 664 N.E.2d 1243, 642 N.Y.S.2d 181 (1996) (finding due process violated because burden of proof in substantiating allegations was not placed on investigating agency); *Richardson v. Chevrefils*, 131 N.H. 227, 552 A.2d 89 (1988); *Wilson v. State Dept. of Human Services*, 969 P.2d 770 (Colo. App. 1998) (finding due process violated because no notice was given to suspected abuser); *Matter of East Park High School*, 314 N.J. Super. 149, 714 A.2d 339 (1998) (finding due process violated by denial of fair administrative hearing); *Cavarretta v. DCFS*, 277 Ill. App. 3d 16, 660 N.E.2d 250, 214 Ill. Dec. 59 (1996) (finding due process implicated by 598-day delay in completing appeals process).

Furthermore, those cases determined that due process interests were strongly implicated because the information contained in the registry was more widely disseminated than under Nebraska's law. See *id.* In the instant case, DSS gave notice to Shearer before her name was placed in the Registry, was required to find that the claim was supported by the preponderance of the evidence, and proceeded without unreasonable delay. Had Shearer chosen to pursue her administrative remedies, she would have been entitled to a fair hearing in which the burden would have been on DSS to sustain its action. There is no evidence that information regarding Shearer was disseminated, even to the limited degree permitted by the Nebraska statutes. The concerns iterated by the above-cited cases are not implicated in this appeal. We, therefore, conclude that the procedures in this case did not violate any "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Davis v. Scherer*, 468 U.S. 183, 191, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984). Consequently, Shearer has not pled facts that breach Allen's and Leuenberger's qualified immunity under § 1983.

### 3. ATTORNEY FEES

Shearer claims on appeal that the trial court erred in denying her motion for attorney fees. Shearer filed two motions for attorney fees in the trial court, and the State also filed its own motion for attorney fees.

The State argues that Shearer is not entitled to attorney fees because she lost in the trial court. Shearer's argument on appeal is based on 42 U.S.C. § 1988(b) (1994), which provides, in relevant part: "In any action or proceeding to enforce a provision of [section] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The State's argument misperceives the circumstances in which a plaintiff may recover attorney fees under § 1988. The U.S. Supreme Court has held that a plaintiff "prevails" when actual relief on the merits of his or her claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Farrar v. Hobby*, 506 U.S. 103, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992). In that regard, the U.S. Supreme Court has said:

> It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under § 1988. A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—*e. g.*, a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*Hewitt v. Helms*, 482 U.S. 755, 760-61, 107 S. Ct. 2672, 96 L. Ed. 2d 654 (1987). Accord, *A.J. by L.B. v. Kierst*, 56 F.3d 849 (8th Cir. 1995); *United Handicapped Federation v. Andre*, 622 F.2d 342 (8th Cir. 1980).

In this case, Shearer succeeded in having her name expunged from the Registry, and the record would support the conclusion that this occurred because of Shearer's lawsuit.

We are prevented from ruling on the issue of attorney fees, however, by the failure of Shearer to present a record that would allow us to make an informed decision. The record indicates

that a hearing on the motions for attorney fees was scheduled for August 8, 1997, at 8 a.m. Shearer's notice of appeal was filed on August 8 at 10:52 a.m. The record does not contain any indication of how the motions were ruled upon by the trial court or what the basis for those rulings may have been.

It is incumbent upon the party appealing to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court is to be affirmed. *State v. Williams*, 253 Neb. 619, 573 N.W.2d 106 (1997); *Allphin v. Ward*, 253 Neb. 302, 570 N.W.2d 360 (1997). Because the record does not reveal how the trial court ruled on the issue of attorney fees, we have no basis to do anything other than affirm the district court's judgment on this particular issue.

### V. CONCLUSION

For the foregoing reasons, we conclude that Shearer's § 1983 action is completely barred by the sovereign immunity of DSS and the appellees in their official capacities and the qualified immunity of the appellees in their individual capacities. Although the district court erred in not so finding, a proper result will not be reversed merely because it was reached for the wrong reasons. *Smith v. Papio-Missouri River NRD*, 254 Neb. 405, 576 N.W.2d 797 (1998). We are precluded by the infirmity of the record from addressing Shearer's assignment of error regarding attorney fees. Consequently, the judgment of the district court is affirmed.

AFFIRMED.

CONNOLLY, J., concurring.

I concur. The majority correctly sets forth the analysis used to determine whether a defendant is entitled to qualified immunity. However, I believe that the majority has incorrectly applied that analysis by failing to consider whether Shearer's allegations, taken as true, stated a legally cognizable claim for the violation of a constitutional right. I conclude that Shearer was denied due process because she was not provided a hearing before her name was put in the Abused or Neglected Child Registry. I nonetheless conclude that the doctrine of qualified immunity bars Shearer's claim because her right to a predeprivation hearing was not clearly established at the time the due process violation occurred.

## I. THRESHOLD QUESTION IN
## QUALIFIED IMMUNITY ANALYSIS

First, we must address whether Shearer's allegations, taken as true, state a claim upon which relief may be granted. See *Siegert v. Gilley*, 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). The majority avoids this threshold question, merely stating that "Shearer's petition, when liberally construed, alleges the violation of a constitutional right." However, *alleging* the violation of a constitutional right is not equivalent to *stating a legally cognizable claim* for the violation of such a right. A theory of recovery is not itself a cause of action. *Olsen v. Olsen*, 248 Neb. 393, 534 N.W.2d 762 (1995). Thus, the mere invocation of "due process" is not sufficient to pass the threshold.

In *Siegert*, the U.S. Supreme Court granted certiorari to clarify the "analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity asserted in a motion for summary judgment." 500 U.S. at 231. The plaintiff, a former government employee, had received an extremely unfavorable review from his supervisor. That review caused a potential employer to deny the plaintiff a position. The plaintiff brought an action against his former supervisor, alleging, inter alia, that the supervisor's review was a malicious, defamatory statement that infringed the plaintiff's liberty interests, in violation of the Due Process Clause of the Fifth Amendment. The supervisor asserted the defense of qualified immunity.

The U.S. Court of Appeals assumed, without deciding, that if the supervisor's alleged defamatory statement was malicious, the supervisor's statement violated the plaintiff's due process rights. The appellate court nonetheless determined that the allegations in the plaintiff's petition were insufficient to state a claim, due to the " 'heightened pleading standard' " in defamation actions. 500 U.S. at 227. Accordingly, the court of appeals held that the supervisor should be granted qualified immunity.

The Supreme Court, noting that the court of appeals had relied on a "heightened pleading standard," held that the plaintiff's claim "failed at an analytically earlier stage of the inquiry into qualified immunity: His allegations, even if accepted as true, did not state a claim for violation of any rights secured to

him under the United States Constitution." 500 U.S. at 227. The Court determined that the court of appeals had erred in assuming, without deciding, that if the plaintiff satisfactorily alleged that the supervisor's unfavorable review was written with malice, a constitutional claim would be stated. "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." 500 U.S. at 232.

In analyzing the qualified immunity question, the Court first addressed whether the plaintiff had stated a legally cognizable claim for the violation of a constitutional right. The Court held that the plaintiff's reputation was not constitutionally protected, even if the alleged defamatory statements were maliciously made, and that the plaintiff had failed to state such a claim. The Court never reached the question of whether the right, alleged by the plaintiff to have been violated, was clearly established. Indeed, the Court could not have determined whether the right was clearly established when that right did not exist.

*Siegert* demonstrates the distinction between the existence of a constitutional right and whether the existence of that right is clear to a government official. To state a claim for the violation of a constitutional right, that right must exist. If there is no such right, or if the alleged facts, taken as true and construed most favorably to the plaintiff, would not entitle the plaintiff to relief for the violation of a constitutional right, a court need not proceed to the next step in a qualified immunity analysis. It is the next step that determines whether that right was clearly established when the conduct occurred.

This analysis was affirmed in *County of Sacramento v. Lewis*, 523 U.S. 833, 841-42 n.5, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998), wherein the Court stated:

> [T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question. . . .

JUSTICE STEVENS suggests that the rule of *Siegert* should not apply where, as here, the constitutional question presented "is both difficult and unresolved." . . . But the generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity *requires some determination about the state of constitutional law* at the time the [defendant] acted. What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional. In practical terms, escape from uncertainty would require the issue to arise in [future suits] . . . . [T]herefore the better approach is to determine the right before determining whether it was previously established with clarity.

(Emphasis supplied.) (Citations omitted.)

Consequently, the threshold question in a qualified immunity case is not whether the plaintiff has alleged, in a colloquial sense, the violation of a constitutional right, but, rather, whether the plaintiff's allegations, taken as true, are sufficient to state a legally cognizable claim for the violation of such a right. See, *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994); *Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir. 1994).

This threshold inquiry is purely a question of law . . . and though this inquiry takes place in the context of a qualified immunity defense, *the same rules governing dismissal of complaints apply*. We "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." . . . A complaint may be dismissed for failure to state a claim "only when it appears that the plaintiff can prove no set of facts in support of the claim[] that would entitle the plaintiff to relief."

(Emphasis supplied.) *Bella v. Chamberlain*, 24 F.3d at 1254. See, also, *Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997); *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d 642 (10th Cir. 1988). "If the plaintiff is unable to marshal evidence indicating that the conduct complained of violated the law as *presently interpreted*, it is unnecessary to consider whether the law was clearly established at the time such conduct occurred." (Emphasis supplied.) *Snell v. Tunnell*, 920 F.2d 673, 696 n.21 (10th Cir. 1990).

Because the majority failed to do so, I analyze whether Shearer's allegations, taken as true, stated a legally cognizable claim for the violation of a constitutional right.

## II. DUE PROCESS

Shearer contends that the requirements of due process were not met by the procedures used by DSS in connection with the placement in and removal of her name from the Registry. Although Shearer's petition does not specify whether the alleged deprivation of due process is procedural or substantive in nature, Shearer's brief argued that the deprivation was procedural. Moreover, the brief's argument was limited to the deprivation of a liberty interest. Thus, liberally construed, Shearer's petition alleges that DSS deprived her of a liberty interest by failing to provide her with fair notice and a hearing prior to putting her name in the Registry.

Procedural due process limits the ability of the government to deprive people of interests which constitute "liberty" or "property" interests within the meaning of the Due Process Clause and requires that parties deprived of such interests be provided adequate notice and an opportunity to be heard. *Bauers v. City of Lincoln*, 255 Neb. 572, 586 N.W.2d 452 (1998). When examining a claim that one is being deprived of a liberty interest without due process of law, a three-stage analysis is employed. *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *overruled on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). The question at the first stage is whether there is a protected liberty interest at stake. *Id.* If so, the analysis proceeds to the second stage, in which it is determined what procedural protections are required.

*Id.* Upon the resolution of that issue, the analysis moves on to the third and final stage, in which the facts of the case are examined to ascertain whether there was a denial of that process which is due. *Id.*

## 1. LIBERTY INTEREST

In *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971), the Supreme Court addressed the constitutionality of a state statute that permitted government officials to post notices banning the sale of intoxicating liquors to certain individuals who exhibited certain traits. The statute did not provide the individual in the posting with notice and a hearing. The Court held that the statute violated due process, stating that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437.

However, in *Paul v. Davis*, 424 U.S. 693, 697, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1975), the Court approved the posting of the plaintiff's name and photograph on a flyer displaying "'active shoplifters'" that city and county police distributed to local merchants. The Court stated that while it had previously

> pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts . . . reputation alone, apart from some more tangible interests such as employment, is [n]either "liberty" [n]or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

424 U.S. at 701. The Court distinguished *Constantineau*, noting that the governmental action in that case had done more than damage the individual's reputation; the action had "deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry." 424 U.S. at 708. The Court stated that it was the alteration of the individual's legal status in *Constantineau*, combined with the injurious defamation, which "justified the invocation of procedural safeguards." 424 U.S. at 709.

"Although *Paul* is the foundation for all subsequent cases dealing with governmental defamation, its meaning is not

unambiguous." *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir. 1989). Nonetheless, when faced with the task of interpreting *Paul,* courts have held that to establish a constitutional violation, one must establish a stigma resulting in the impairment of some right other than reputation, or " 'stigma plus.' " *Id.* Therefore, the question is, Does the placement of an individual's name in the Registry cause "stigma plus"?

In *Valmonte v. Bane,* 18 F.3d 992 (2d Cir. 1994), the court held that the inclusion of the plaintiff's name in New York's central register resulted in stigma, i.e., public opprobrium and damage to reputation. The court noted that inclusion in the register brands an individual a "child abuser, which certainly calls into question [one's] 'good name, reputation, honor, or integrity.' " *Id.* at 1000, quoting *Board of Regents v. Roth,* 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The court noted that even the limited disclosure of information contained in the register was sufficient to establish stigma because New York's scheme required certain employers to consult the register.

The court also held that inclusion in the register met *Paul's* "plus" requirement. The court noted that *Paul's* holding requiring more than mere defamation to support a cognizable liberty interest indicates that the normal repercussions of a poor reputation, including loss of employment opportunities, are likewise insufficient to establish a liberty interest. " '[S]o long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not [constitutionally] recoverable . . . .' " (Emphasis omitted.) *Valmonte v. Bane,* 18 F.3d at 1001, quoting *Siegert v. Gilley,* 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991).

However, the court noted that the inclusion of the plaintiff's name in New York's register did more than merely defame the plaintiff, it placed a "tangible burden on her employment prospects." *Id.* This conclusion was based on New York's requirement that all child-care providers consult the register when hiring. Thus, by operation of law, potential employers would be informed of the plaintiff's inclusion on the register. "This is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impedi-

ment established by the state." *Id.* at 1001. Accordingly, the court held that the plaintiff had established a liberty interest.

The Eighth Circuit has addressed a similar statutory scheme and held that identifying individuals as child abusers gives rise to a liberty interest. *Bohn v. County of Dakota*, 772 F.2d 1433 (8th Cir. 1985). However, the Eighth Circuit did not base this conclusion on an impairment of employment rights; rather, the "plus" was the impairment of the Bohns' familial rights.

> [T]he Bohns have a protectible [sic] interest in their reputations at stake in this case. By identifying the Bohns as child abusers, investigating the quality of their family life, and maintaining data on them, the County Department [of Social Services] exposed them to public opprobrium and may have damaged their standing in the community. . . .
>
> . . . When the County Department found Bohn to be a child abuser, it drove a wedge into this family and threatened its very foundation. The stigma Mr. Bohn suffers as a reported child abuser undoubtedly has eroded the family's solidarity internally and impaired the family's ability to function in the community. In light of these clear adverse effects on familial integrity and stability, we find that Mr. Bohn's reputation is a protectible [sic] interest. Because this stigma strikes so directly at the vitality of the family, we find the reputation interest at stake to be clearly distinguishable from the respondent's record of petty crimes in *Paul* [*v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1975)], which was tied to no other protectible [sic] interest.

*Bohn v. County of Dakota*, 772 F.2d at 1436 n.4.

Several state courts that have addressed whether central register statutes violate due process have also held that the inclusion of one's name on such a register implicates a liberty interest, either under the federal or a state constitution. See, e.g., *Petition of Preisendorfer*, 719 A.2d 590 (N.H. 1998); *State v. Jackson*, 269 Ga. 308, 496 S.E.2d 912 (1998); *A.Y. v. Com., Dept. of Public Welfare*, 537 Pa. 116, 641 A.2d 1148 (1994); *Watso v. Dept. of Social Services*, 841 P.2d 299 (Colo. 1992); *Matter of East Park High School*, 314 N.J. Super. 149, 714 A.2d 339 (1998).

However, several courts have held to the contrary. See, e.g., *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994); *Arkansas Dep't of Human Servs. v. Heath*, 312 Ark. 206, 848 S.W.2d 927 (1993); *Carter v. Gordon*, 28 Va. App. 133, 502 S.E.2d 697 (1998). In *Hodge v. Jones, supra*, the court addressed whether the government's maintenance of records of a child abuse investigation of the plaintiffs implicated the plaintiffs' liberty interest in familial privacy. The court held that no such interest attached, since the maintenance of such records has no significant impact on the child-parent relationship or on the family's ability to function. *Id.* The court distinguished *Bohn v. County of Dakota, supra*, in a footnote, noting that in *Bohn*, the social workers had "repeatedly met with the Bohn family in an attempt to halt the purported abuse and related problems, thereby engaging in a campaign of intrusive conduct," whereas in *Hodge*, once the investigation was complete, the record was allowed to "lie fallow." 31 F.3d at 164.

The *Hodge* court's attempt to distinguish *Bohn* is unpersuasive. Neb. Rev. Stat. § 28-713 (Reissue 1995) requires DSS to investigate child abuse allegations and to "provide such social services as are necessary and appropriate under the circumstances to protect and assist the child and to preserve the family." Thus, DSS is required to engage in an "intrusive campaign" of repeated meetings with the family, as in *Bohn*, if such a campaign is necessary and appropriate under the circumstances. DSS' involvement is not limited to making reports that are designed to "lie fallow." See Neb. Rev. Stat. § 28-713.01 (Reissue 1995). Rather, Nebraska's statutory scheme mandates the type of comprehensive involvement that was at issue in *Bohn*.

In *Arkansas Dep't of Human Servs. v. Heath, supra*, the Arkansas Supreme Court likewise held that the inclusion of one's name in a register of child abusers does not implicate a liberty interest, relying on the U.S. Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1975). The plaintiff in *Heath* had appealed his inclusion in the register as a " 'substantiated' " abuser through administrative channels and then to a court, which court concluded that the allegations of abuse were " 'unsubstantiated.' " 312 Ark. at 208,

848 S.W.2d at 928. Nonetheless, the statutes governing the register required the administrative agency to retain "unsubstantiated" reports for a period of 3 years. In a dissenting opinion, Justice Corbin noted the seeming inconsistency between the administrative and judicial processes.

> What a hollow victory it is for Mr. Heath. He is declared innocent of child abuse in our state court system which utilized concepts of due process, but is still forced for three years to carry the label of child abuser by an administrative agency of the state acting under the auspices of the state legislature. . . .
>
> Surely, the courts have the inherent power to provide a remedy to one whose rights have been violated by the capricious exercise of legislative power as in the instant case. What good does it do to provide Mr. Heath procedural due process in our court system but deny him a remedy or any sense of justice?

*Arkansas Dept. of Human Services v. Heath*, 312 Ark. at 219, 848 S.W.2d at 933-34 (Corbin, J., dissenting).

In *Carter v. Gordon, supra*, the court rejected the plaintiff's claim that inclusion in a central registry involved the plaintiff's liberty interest in employment. The court noted that it was the action of the plaintiff's employer that deprived the plaintiff of employment, not the administrative agency responsible for the register. The court found it significant that the plaintiff had pointed to no rule that inclusion in the register automatically disqualified an applicant for a particular position.

This argument ignores the fact that *Paul's* "plus" requirement requires only the *impairment* of a right. In *Matter of East Park High School*, 314 N.J. Super. 149, 714 A.2d 339 (1998), the court noted that the inclusion in a central registry is inextricably intertwined with the capacity to obtain employment in a vast array of jobs involving children. The court held that the fact that the plaintiff had not asserted an interest in changing jobs at that point in time was of no consequence to the court's liberty interest analysis. "The inclusion of her name in the Central Registry is a kind of Sword of Damocles poised above her head. Its clear effect is to inhibit her from even considering any life changes for fear of disclosure." *Id.* at 163, 714 A.2d at 347.

Neb. Rev. Stat. § 28-726 (Reissue 1995) ensures that employers dealing with children have access to the Registry. Subsection (4) provides access to any "agency having the legal responsibility or authorization to care for, treat, or supervise an abused or neglected child . . . who is the subject of a report." The word "agency" is not limited to governmental agencies, nor is it limited to agencies specializing in the care of abused or neglected children. When addressing a similar statute, the New Jersey Superior Court held that the word "agency" applied to the New Jersey Department of Education, since that department has the responsibility to " 'supervise' the care and treatment" provided to students while they are under temporary guardianship at a day school. *Physical Abuse at Blackacre Acad.*, 304 N.J. Super. 168, 179-80, 698 A.2d 1275, 1281 (1997). Thus, schools, hospitals, day care facilities, and virtually any other agency authorized to supervise children would have the right, when caring for a child known to be in the Registry, to access the Registry (a point DSS impliedly concedes in its brief).

Finally, insofar as one's familial rights are concerned, Neb. Rev. Stat. § 43-107 (Reissue 1993) prohibits the entry of an adoption decree until a check of the Registry is on file with the court. Although the inclusion of one's name in the Registry does not, per se, prohibit one's adoption of a child, it most certainly would impede any adoption.

The placement of Shearer's name in the Registry in the instant case was required by state law. It had the imprimatur of official action, which usually implies that the information at issue has been tried and tested according to the dictates of due process. This is unlike the posting in *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1975), which was, at most, a local effort by certain police officers. An employer would be expected to place much greater reliance on a listing in an official government repository than the obviously makeshift postings of local law enforcement. Thus, the instant case is easily distinguishable from *Paul*—the plaintiff in the instant case was faced with "stigma plus."

Inclusion in the Registry is a stigma that fundamentally alters an individual's relation to employers and family and thus, curtails the most basic liberties that a citizen by right may

enjoy. Therefore, I conclude that Shearer's liberty interests were implicated in the instant case and thus, that the due process clause applies.

## 2. PROCEDURAL PROTECTIONS DUE

Having concluded that the Due Process Clause applies, the question is, What process is due? The majority correctly points out that under Neb. Rev. Stat. § 28-723 (Reissue 1995), an individual whose name is placed in the Registry may ask DSS to amend or expunge the report from the Registry, and that if DSS does not do so within 30 days, the individual is entitled to a fair hearing. However, this hearing is available only *after* the individual's name has already been included in the Registry. See §§ 28-713.01 and 28-723. Shearer argues that she was entitled to notice and a fair hearing *before* her name was added to the Registry. Thus, the question is whether due process entitled Shearer to a predeprivation hearing, as opposed to a postdeprivation hearing.

As a general rule, the Due Process Clause requires that individuals receive notice and a meaningful opportunity to be heard *before* the government deprives them of their liberty interest. See, *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). However, "[w]e tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in ' "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." ' " *United States v. James Daniel Good Real Property*, 510 U.S. at 53, quoting *Fuentes v. Shevin*, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). See, also, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982) (noting that postdeprivation process may be sufficient when state must necessarily act quickly or it is impractical to provide predeprivation process). Whether such an exception applies requires an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings. *United States v. James Daniel Good Real Property, supra*. In this regard, we consider (1) the

private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*; *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

### (a) Private Interest

An individual's liberty interest in employment is clearly substantial, e.g., *Petition of Preisendorfer*, 719 A.2d 590 (N.H. 1998), as is an individual's liberty interest in familial relationships, e.g., *Petition of Bagley*, 128 N.H. 275, 513 A.2d 331 (1986).

### (b) Risk of Erroneous Deprivation

Even more clear is the enormous risk of erroneous deprivation presented by allowing DSS to place names, and more important, its "case status determination" in the Registry without a predeprivation hearing. See *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994). Nebraska statutes do not provide any specific standards that must be met prior to the placement of information in the Registry. Neb. Rev. Stat. § 28-720 (Reissue 1995) states only that all cases in the Registry shall be classified as either (1) court-substantiated, (2) petition to be filed, (3) investigation inconclusive, or (4) unfounded report, whichever the case may be. DSS has enacted a regulation establishing when a particular case shall be entered into the Registry. According to state regulation 390 Neb. Admin. Code ch. 4 § 008.01 (1995), once the·"initial assessment phase" is complete, the protective services worker will make a "case status determination." The regulation states that "[t]he decision at this point is whether there is *credible evidence* to support the finding that child abuse or neglect as defined by state statute has occurred." (Emphasis supplied.) *Id.* The "case status determinations" available are identical to those classifications listed in § 28-720. Once a case status determination is made, the "case status determination

will be entered into the Child Welfare Information System in a timely manner." *Id.*

In *Valmonte v. Bane*, 18 F.3d at 1004, the court held that the "'some credible evidence'" standard led to an unacceptably high level of risk.

> The "some credible evidence" standard does not require the factfinder to weigh conflicting evidence, merely requiring the local DSS to present the bare minimum of material credible evidence to support the allegations against the subject. . . .
>
> The "some credible evidence" standard is especially dubious in the context of determining whether an individual has abused or neglected a child. Such determinations are inherently inflammatory, and "unusually open to the subjective values of" the factfinder. . . . They are especially open to such subjectivity when the factfinder is not required to weigh evidence and judge competing versions of events, and where one side has the greater ability to assemble its case.

*Id.*

The obvious lack of judgment on the part of the caseworker in the instant case demonstrates the high risk of error in Nebraska's system. One simply does not base a judgment *solely* on the hearsay contained in a police report without expecting error to occur. If such a system is followed, error is inevitable.

### (c) State Interest

DSS undoubtedly has a strong interest, under the doctrine of parens patriae, in the protection of children within its borders. See *In re Interest of R.G., supra.* However, we need not weigh the "fiscal and administrative burdens" that any additional procedural requirement would entail, since the statute already requires a fair hearing, with all its attendant costs. Shearer is not asking for *more* procedure but an *earlier* procedure. Consequently, the more pertinent question in the instant case is what interest DSS has in a postdeprivation hearing as opposed to a predeprivation hearing.

DSS asserts that its interest in quickly registering the names of suspected child abusers to prevent further instances of such

conduct defeats Shearer's argument that such suspects have the right to a predeprivation hearing. However, it is difficult to see how DSS' interest in protecting children is more efficiently served by entering suspects' names immediately. Any risk of further harm to the child whose abuse or neglect gave rise to the involvement of DSS will already have been averted, regardless of when information is added to the Registry. See § 28-713 (stating that law enforcement agency receiving call reporting abuse and neglect shall take immediate steps to protect child). Moreover, to the extent that quickly placing information in the Registry leads to inaccuracies, DSS' interests are disserved. See *Dept. of Health & Rehab. Services v. S.*, 648 So. 2d 128 (Fla. 1995) (listing interests served by child abuse registries).

In short, the facts in the instant case belie DSS' asserted need to forgo a predeprivation hearing. The incident giving rise to Shearer's inclusion in the Registry occurred on June 28, 1995. For unexplained reasons, the DSS worker did not contact Shearer until August 21, almost 2 *months* after the child had allegedly been harmed. By the time DSS put Shearer's name in the Registry on December 4, 5 months had passed. Certainly a predeprivation administrative hearing could have taken place in that time, had DSS acted diligently.

### (d) Balancing

As the above analysis demonstrates, the individual interest in the instant case is strong, the risk of error is high, and DSS' interest in forgoing a predeprivation hearing is low. If erroneous information is added to the list, the damage to the individual may be done before a postdeprivation hearing is conducted to remove that information. However, the risk of damage to DSS if a predeprivation hearing is required is low. Therefore, I conclude that due process requires a predeprivation hearing prior to the placement of information in the Registry.

### 3. DENIAL OF DUE PROCESS

Having determined what process is due, the final question of the due process analysis is whether there was a denial of that process which is due in the instant case. The evidence conclusively indicates that Shearer did not receive a predeprivation

hearing before her name was placed in the Registry. Thus, her due process rights were violated.

## III. CLEARLY ESTABLISHED

Because Shearer's allegations state a legally cognizable claim for the violation of her constitutional right to due process, the next question is whether that right was clearly established at the time DSS acted. We note that this court has not previously addressed the application of due process to Nebraska's Registry statutes. By its plain language, this statutory scheme contemplates only a postdeprivation hearing. A right cannot be said to have been clearly established when the conduct at issue was authorized by statute and no court had interpreted the statute at the time that the conduct at issue occurred. *Duncan v. Gunter*, 15 F.3d 989 (10th Cir. 1994). Accordingly, the right to a predeprivation hearing was not clearly established at the time that the unconstitutional conduct occurred. Therefore, the majority properly concluded that qualified immunity applies, and I concur.

MILLER-LERMAN, J., joins in this concurrence.