714 A.2d 339 (1998)
314 N.J. Super. 149
In the Matter of ALLEGATIONS OF SEXUAL ABUSE AT EAST PARK HIGH SCHOOL.[1]
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1998.
Decided July 21, 1998.
*340 Arnold M. Mellk, Princeton, for appellant (Wills, O'Neill & Mellk attorneys; Patricia L. Ratner, on the brief).
Bertram P. Goltz, Deputy Attorney General, for respondent New Jersey Division of Youth and Family Services (Peter Verniero, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Deborah Berk, Deputy Attorney General, on the brief).
Before Judges LONG, KLEINER and KIMMELMAN.
The opinion of the court was delivered by *341 LONG, P.J.A.D.
In 1993, appellant Marjorie Spencer, a teacher in the East Park School system, was accused by a fellow teacher, Jeffrey Wallace, of inappropriate sexual behavior and physical conduct with a student, Arthur Edwards. Respondent Division of Youth & Family Services (DYFS) was notified by East Park School officials and it, in turn, contacted the county prosecutor and local law enforcement. All three agencies then investigated the allegations. This included interviews with Mrs. Spencer, Mr. Wallace, Arthur Edwards, students Richard Carlson and John Norman, other student witnesses, and school administrators. Mrs. Spencer denied all of the allegations against her. At the conclusion of the investigation, the county prosecutor closed his file without charging Mrs. Spencer or presenting the matter to the Grand Jury. However, in February of 1994, the investigating arm of DYFS, the Institutional Abuse Investigation Unit (IAIU), having given Mrs. Spencer the right to submit a sworn statement, which she declined to do, concluded that the allegations of sexual abuse against her had been "substantiated." Mrs. Spencer appealed that finding to us.
Subsequently, the East Park School Board filed fifteen tenure charges against Mrs. Spencer stemming from her alleged sexual abuse of Arthur Edwards, Richard Carlson and John Norman. After certifying the charges, the matter was transferred to the Office of Administrative Law (OAL) for a hearing. DYFS then moved for and was granted a stay of this appeal pending the outcome of the tenure hearing which it argued might render moot the issues raised here.
The sordid details of the allegations against Mrs. Spencer need not be related except to say that if the claims of Wallace, Edwards, Carlson and Norman had been proved, it would not only have warranted a finding of "substantiated" sexual abuse, but likely would have resulted in criminal charges along with the loss of Mrs. Spencer's tenured position. However, they were not sustained.
A three day hearing was held at which Carlson did not testify and Norman presented evidence favorable to Mrs. Spencer. Wallace, Edwards and another student, Peter Finch, testified for the school district. At the end of the hearing, the Administrative Law Judge (ALJ) dismissed all of the tenure charges against Mrs. Spencer. In so doing, she specifically rejected, as incredible, the testimony of Wallace and Edwards and the supporting testimony of Finch. Indeed, she characterized Edwards' testimony as "so unbelievable that it is understandable why he fled from New Jersey to avoid testifying before a grand jury." The ALJ fully accepted Mrs. Spencer's denial of the charges to which she testified in detail. Her fellow teachers' characterizations of her as a teacher above reproach was also credited by the ALJ who noted that Mrs. Spencer had worked in the school district since 1981 without ever having a discipline charge or even a poor evaluation and that her conduct was "exemplary." The Commissioner of Education adopted the ALJ's decision as final and the State Board of Education affirmed upon the school district's appeal, declaring that the board "failed to meet its burden of demonstrating the truthfulness of the tenure charges."
Despite these conclusions having been reached after a full hearing at which the allegations of sexual abuse against Mrs. Spencer were tested in the crucible of a trial, DYFS refused to alter its determination that the charges of sexual abuse against Mrs. Spencer were substantiated.
Mrs. Spencer then sought to pursue her earlier appeal of DYFS's findings of substantiated sexual abuse. After some procedural maneuvering, DYFS proposed a settlement: if Mrs. Spencer was willing to forego her appeal, it was willing to include information about the outcome of the tenure hearing in its report maintained in its Central Registry.
Mrs. Spencer declined the offer and now proceeds with her appeal challenging the propriety of the continued inclusion of her name in DYFS's Central Registry. More particularly, Mrs. Spencer contends that the manner in which DYFS reached its conclusions denied her due process and that, in any *342 event, DYFS is bound by the decision of the State Board of Education.

I
Statutory authority for DYFS to investigate and monitor child abuse allegations appear in N.J.S.A. 9:6-8.8 to -8.98. Under N.J.S.A. 9:6-8.10, a person who has reason to believe that a child has been subjected to child abuse is required to report that suspicion to DYFS. Upon receiving such a report, DYFS must take immediate action to protect the child and must report the matter to the Central Registry within 72 hours. N.J.S.A. 9:6-8.11. The regulations adopted to implement the statute require DYFS to evaluate the available information to determine whether that allegation is "substantiated," "not substantiated" or "unfounded." See N.J.A.C. 10:129A-3.3(a). These terms are defined as follows:
1. "Substantiated" when the available information, as evaluated by the Division representative, indicates that a child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3 because the child has been harmed or placed at risk of harm by a parent, caretaker or institutional caretaker.
* * *
2. "Not substantiated" when the available information, as evaluated by the Division representative, provides some indication that a child was harmed or placed at risk of harm, but does not indicate that the child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3; or
3. "Unfounded" when:
i. There is no evidence of conduct that would pose risk to the child;
ii. There is no evidence that a parent, caretaker, temporary caretaker, institutional caretaker or child was involved; or
iii. The available information indicates that the actions of the parent, caretaker, temporary caretaker, or institutional caretaker were necessary and reasonable and the incident was an accident.[2]
[N.J.A.C. 10:129A-3.3.]
DYFS must notify the alleged perpetrator and others[3] of the outcome of its investigation. More particularly, DYFS must notify each person "identified as the perpetrator in a case of substantiated child abuse" that:
1. He or she has been identified as a perpetrator of child abuse or neglect;
2. His or her name and identifying information are entered into the Division's Central Registry, N.J.S.A. 9:6-8.11; and
3. He or she may have an opportunity to dispute the findings of a local Division office or institutional abuse investigation unit of the Division in accordance with N.J.A.C. 10:120A.
[N.J.A.C. 10:129A-3.4.]
These reports are "confidential", N.J.S.A. 9:6-8.40, but may be disclosed upon written request for certain statutorily authorized purposes including use by police in investigations of allegations of child abuse, by physicians who suspect abuse, by a court or a grand jury. N.J.S.A. 9:6-8.10a(b)(1) to -8.10a(b)(8). In addition, disclosure may be made to:
Any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual employed by or seeking employment with an agency or organization providing services to children;
Any person or entity conducting a disciplinary, administrative or judicial proceeding to determine terms of employment or continued employment of an officer, employee, or volunteer with an agency or organization providing services for children. The information may be disclosed in whole or in part to the appellant or other appropriate person only upon a determination by the person or entity conducting the proceeding that the disclosure is necessary to make a determination.

*343 [N.J.S.A. 9:6-8.10a(b)(13) to -8.10a(b)(14).]
Further, disclosure may be made upon written request to:
The members of a county multi-disciplinary team, established in accordance with State guidelines, for the purpose of coordinating the activities of agencies handling alleged cases of child abuse and neglect;
A person being evaluated by the division or the court as a potential care-giver to determine whether that person is willing and able to provide the care and support required by the child;
The legal counsel of a child, parent or guardian, whether court-appointed or retained, when information is needed to discuss the case with the division in order to make decisions relating to or concerning the child;
A person who has filed a report of suspected child abuse or neglect for the purpose of providing that person with only the disposition of the investigation;
A parent or legal guardian when the information is needed in a division matter in which that parent or guardian is directly involved. The information may be released only to the extent necessary for the requesting parent or guardian to discuss services or the basis for the division's involvement or to develop, discuss, or implement a case plan for the child;
A federal, State, or local government entity, to the extent necessary for such entity to carry out its responsibilities under law to protect children from abuse and neglect;
Citizen review panels designated by the State in compliance with the federal "Child Abuse Prevention and Treatment Act Amendments of 1996," Pub.L. 104-325;
The Child Fatality and Near Fatality Review Board established pursuant to P.L. 1997, c. 175 (C.9:6-8.83 et al).
[N.J.S.A. 9:6-8.10(b)(15) to -8.10a(b)(22).]
In addition, if a person applies to become a foster-parent, DYFS must check the Central Registry for evidence of child abuse. N.J.A.C. 10:122C-2.6. Likewise, if an adoption is pending, at the request of an approved agency, the records of DYFS will be searched for "dispositions of child abuse or neglect," and that information will be provided to the approved agency for consideration. N.J.S.A. 9:3-54.2(b)(2).
L. 1997, c. 254, effective March 16, 1998 and now codified at N.J.S.A. 30:5B-6.1 to -6.9, expanded the use of the Central Registry and made resort to it mandatory in connection with "Child Care Center Operators" seeking new or renewal licensure or approval under N.J.S.A. 30:5B-1 to -25.3. Those entities include a vast array of public and private child care alternatives ranging from young mothers caring for children in their homes to county park recreation centers along with the entire spectrum in between:
"Child care center" or "center" means any facility which is maintained for the care, development or supervision of six or more children who attend the facility for less than 24 hours a day. In the case of a center operating in a sponsor's home, children who reside in the home shall not be included when counting the number of children being served. This term shall include, but shall not be limited to, day care centers, drop-in centers, nighttime centers, recreation centers sponsored and operated by a county or municipal government recreation or park department or agency, day nurseries, nursery and play schools, cooperative child centers, centers for children with special needs, centers serving sick children, infant-toddler programs, school age child care programs, employer supported centers, centers that had been licensed by the Department of Human Services prior to the enactment of the "Child Care Center Licensing Act," P.L. 1983, c. 492 (C. 30:5B-1 et seq.) and kindergartens that are not an integral part of a private educational institution or system offering elementary education in grades kindergarten through sixth, seventh or eighth.
[N.J.S.A. 30:5B-3(b).]
As amended, the Act requires that upon receipt of a license or renewal application
the division shall conduct a check of the division's child abuse records to determine if an incident of child abuse or neglect has *344 been substantiated pursuant to section 4 of P.L. 1971, c. 437 (C.9:6-8.11), against any staff member.
[N.J.S.A. 30:5B-6.2(a).]
Further,
[t]he division shall not issue a regular license or approval to a center until the division determines that no staff member employed by or working at the center has a record of substantiated child abuse or neglect.
The division shall deny, revoke or refuse to renew the center's license or approval, as appropriate, if the division determines that an incident of child abuse or neglect by an owner or sponsor of a center had been substantiated.
[N.J.S.A. 30:5B-6.2(b), -6.2(c).]
The owner and sponsor of a child care center is required to cooperate with DYFS's inquiries at the risk of suspension, revocation or non-licensure for failure to do so. N.J.S.A. 30:5B-6.3(b).
Additionally, if any
staff member of a center, other than the owner or sponsor, refuses to consent to, or cooperate in, the securing of a division child abuse record information check, the person shall be immediately terminated from employment at the center.
[N.J.S.A. 30:5B-6.3(c).]
The Act requires that
within two weeks after a new staff member's employment, the owner or sponsor of a center shall notify the division to conduct a check of its child abuse records to determine if an incident of child abuse or neglect has been substantiated against the staff member.
[N.J.S.A. 30:5B-6.4(a).]
Until the results of the child abuse record information check on a new staff member have been received by the center owner or sponsor, the staff member shall not be left alone at the center caring for children.
[N.J.S.A. 30:5B-6.4(b).]
If the division determines that an incident of child abuse or neglect by the staff member has been substantiated, the division shall advise the center owner or sponsor of the results of the child abuse record information check and the center shall immediately terminate the person from employment at the center.
[N.J.S.A. 30:5B-6.4(c)(emphasis added).]
"The division shall complete the child abuse record information check within 45 days after receiving the request for the check." N.J.S.A. 30:5B-6.5. The new Act also provides that:
[t]he division shall consider, for the purposes of this act, any incidents of child abuse or neglect that were substantiated on or after June 29, 1995, to ensure that perpetrators have had an opportunity to appeal a substantiated finding of abuse or neglect; except that the division may consider substantiated incidents prior to that date if the division, in its judgment, determines that the individual poses a risk of harm to children in a child care center. In cases involving incidents substantiated prior to June 29, 1995, the division shall offer the individual an opportunity for a hearing to contest its action restricting the individual from employment in a child care center.
[N.J.S.A. 30:5B-6.6 (footnote omitted).]
The actions DYFS took in this case preceded the enactment of L. 1997, c. 254 (N.J.S.A. 30:5B-6.1 to -6.9). When Mrs. Spencer was accused of sexual abuse in 1994, the only opportunity she was offered to defend herself was the chance to submit a statement under oath to the IAIU. Since that time, the DYFS "Support Operations" manual (Manual) has been amended to provide that when a determination has been made that an allegation of abuse has been substantiated, the perpetrator is notified that he or she has the right to request a Regional Dispositional Conference to dispute those findings, either at a hearing or at a record and document review, at the discretion of DYFS. The accused person may be represented and may bring witnesses or produce statements on his or her behalf.
According to the Manual, a written decision is to be made within sixty working days of the Regional Dispositional Conference, *345 and must indicate whether it is final (appealable to the Appellate Division) or is subject to further DYFS or OAL review. Despite the reference to potential referral to the OAL for a hearing, DYFS adopted new regulations effective February 2, 1998, stating in part that a "[r]equest to change a finding in a child abuse investigation" is among the requests not to be transmitted to the OAL. See N.J.A.C. 10:120A-4.2(c)3. In any event, none of these procedures were available when Mrs. Spencer came under scrutiny.

II
We turn first to the question of what process is due when a citizen seeks to challenge the inclusion of his or her name on the Central Registry list of "substantiated" abusers. The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Likewise, Article I, paragraph 1 of the New Jersey Constitution, although not cast in due process terms, has been held to protect "`values like those encompassed by the principle[ ] of due process.'" Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985)). The exact contours of due process cannot be defined. What it commands depends upon the specific facts presented. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961); Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960).
In assessing whether particular administrative procedures are constitutionally sufficient, the primary question is always whether there is a protectible liberty interest at stake. Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 154-55, 390 A.2d 90 (1978). This inquiry is the first prong of the three-pronged test enunciated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and adopted by our Supreme Court in J.E. on Behalf of G.E. v. State, 131 N.J. 552, 566, 622 A.2d 227 (1993) as the applicable standard in determining what procedures will assure fairness in an administrative proceeding. Mathews further requires us to consider
the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
[424 U.S. 319 at 335-36, 96 S.Ct. 893.]
With respect to the issue of whether Mrs. Spencer has a protectible interest at stake here, she argues that the inclusion of her name in the Central Registry not only stigmatizes her as a child abuser but that the incursion on her employment rights which that stigmatization causes, entitles her to due process protections. We agree.
The cases interpreting the Fourteenth Amendment do not recognize reputational injury as a constitutionally protectible private interest and have required "stigma plus" to establish a constitutional deprivation. Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405, 414 (1976). In other words, under the federal cases, mere damage to reputation, apart from impairment of some additional interest previously recognized under state law, does not trigger due process protections. Sturm v. Clark, 835 F.2d 1009, 1012 (3rd Cir.1987). Thus, in order to find a federal due process entitlement, a court must assess whether plaintiff established damage to his or her reputation and impairment of some other interest.
The state constitution, however, has a broader due process reach than the Fourteenth Amendment. It gives a plaintiff a protectible interest in reputation warranting due process protections "without requiring any other tangible loss." Doe, supra, 142 N.J. at 104-05, 662 A.2d 367.
Thus, a starting point in a case such as this, under both the federal and state constitutions, is the question of stigma or injury to reputational interests. Doe, supra, is instructive on this issue. There, the Supreme *346 Court addressed the registration and notification procedures of Megan's Law, N.J.S.A. 2C:7-1-11, which not only require a sex offender to register at the local police station, but also require various public notifications of his or her relocation to an area. The level of notification depends on the convicts "tier status" which, in turn, is based upon the risk of re-offense.[4]Doe held that such notification is the kind of reputational injury which equates with stigma, warranting a due process hearing under the state constitution, and, coupled with impairment to privacy interests, under the federal constitution as well.[5] We think this conclusion is equally applicable here.
To be sure, the level of revelation in Doe is different from what occurs in a case such as this in which broad disclosure is not made to the general public. However, many private citizens associated with private child care agencies will, of necessity, become privy to the Central Registry information under Chapter 254. We know this because the licensure of their private agencies will depend on clearance through the Central Registry. It follows that a Central Registry rationale for non-licensure or non-renewal will be made public, albeit on a less expansive basis than under Megan's Law. However, on the other side of the balance, the subjects in Doe have already suffered gross impairment of their reputations, having been publicly charged, convicted and sentenced as sex offenders. They have already either been tried and found guilty beyond a reasonable doubt or have acknowledged their guilt in a public forum. Thus, their reputations have already suffered grievous besmirchment.
On the contrary, Mrs. Spencer is a teacher with an unblemished reputation not only in her school, but in the larger community. The loss of her good reputation, when the Central Registry information is shared with even a few private citizens, will irrevocably injure her previously good name. Thus, while the expansiveness of the notification here is significantly more circumscribed than in Doe, the reputational loss to Mrs. Spencer and others like her from the dissemination of Central Registry information is so enormous that there is parity between this and a Megan's Law case in terms of stigma. According to Doe, this injury to good name and reputation, standing alone, is a protectible private interest under the New Jersey Constitution. Doe, supra, 142 N.J. at 104-05, 662 A.2d 367.
In this case however, the injury to reputation does not stand alone. The Central Registry revelations not only injure Mrs. Spencer's good name but are inextricably intertwined with her capacity to obtain employment in a vast array of education-related jobs. Prospective child care employers are not only likely to come into possession of information about Mrs. Spencer's status as a child sex abuser but are compelled to do so and, more importantly, are prohibited from employing her under the recent statutory amendments at the risk of loss of licensure. This constitutes "foreclosure" from employment for which Mrs. Spencer has been trained and at which she has spent her career. The fact that she is presently employed as a tenured teacher does not detract from the power of that foreclosure. See Nicoletta v. North Jersey Dist. Water Supply Comm'n, supra, 77 N.J. at 160-61, 390 A.2d 90 (finding the impairment of future employability by operation of state law to be a protectible liberty interest).
Further, fact that Mrs. Spencer has not asserted an interest in changing jobs at this point is of no consequence to our analysis.
*347 The inclusion of her name in the Central Registry is a kind of Sword of Damocles poised above her head. Its clear effect is to inhibit her from even considering any life changes for fear of disclosure.
The conjunction between the defamation of Mrs. Spencer's good name and the statutory impediment to hiring her is what meets the stigma-plus test of the federal cases (i.e.), Paul v. Davis, supra, 424 U.S. at 705-06, 96 S.Ct. at 1162-63, 47 L.Ed.2d at 416 (citing Cafeteria Workers v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. at 1750, 6 L.Ed.2d at 1238). Thus, Mrs. Spencer has a protectible liberty interest (the right to work) subject to due process under both the federal and state constitutions. Valmonte v. Bane, 18 F. 3d 992, 999 (2d Cir.1994) (finding protectible liberty interest where defamation occurred precisely in conjunction with plaintiff's attempt to obtain employment within child care field). See also, Lee TT. v. Dowling, 87 N.Y.2d 699, 664 N.E.2d 1243, 642 N.Y.S.2d 181 (1996).
We note that the same analysis is applicable if stigmatization is added to the impairment of Mrs. Spencer's right to adopt or become a foster parent which also implicates weighty personal interests. See Smith v. Organization of Foster Families, 431 U.S. 816, 838-47, 97 S.Ct. 2094, 2106-11, 53 L.Ed.2d 14, 31-37 (1977); Spielman v. Hildebrand, 873 F.2d 1377, 1384-85 (10th Cir. 1989); Thelen v. Catholic Soc. Servs., 691 F.Supp. 1179 (E.D.Wis.1988).
The second Mathews issue is whether there is a risk of an erroneous deprivation of such interest through the DYFS administrative procedures and whether additional procedural safeguards will enhance the reliability of a "substantiated abuse" determination. Put another way, is the process DYFS affords adequate to protect Mrs. Spencer's interest? If not, are there additional procedural safeguards which would suffice?
Certainly, the procedure which was actually accorded to Mrs. Spencer (only the right to submit a sworn statement) was inadequate to test the charges because the outcome depended upon a credibility evaluation of Mrs. Spencer and the witnesses against her, who she was not allowed to cross-examine. High Horizons Dev. Co. v. State Dep't. of Transportation, 120 N.J. 40, 575 A.2d 1360 (1990).
Moreover, to the extent that DYFS's revised Manual procedures specifically deny an administrative hearing to challenge a finding in a child abuse investigation (N.J.A.C. 10:120A-4.2(c)3), they suffer from the same infirmity as their predecessorsthey allow a quasi-judicial determination of "disputed adjudicative facts" without a quasi-judicial proceeding to undergird it. High Horizons, 120 N.J. at 53, 575 A.2d 1360; Cunningham v. Dep't of Civil Serv., 69 N.J. 13, 21, 350 A.2d 58 (1975). One need only look to the outcome of the tenure hearing to observe the deficiencies in the DYFS procedure. Tested in a trial type hearing, Mrs. Spencer's accusers were revealed as liars and plotters. Such judgments cannot fairly be made outside a true truth-testing process. While the revised procedures have the benefit of flexibility and informality and may indeed resolve some challenges to a DYFS finding, where after exhaustion of the informal procedures, the subject maintains his or her innocence and challenges the DYFS "substantiated abuse" finding as a matter of fact, a trial type proceeding is the only way to assure that a reliable judgment will be made. At the very least, it would eliminate the appearance of partiality which inexorably flows when a DYFS employee reviews a decision of that agency that abuse is substantiated. J.E. on behalf of G.E., supra, 131 N.J. at 568, 622 A.2d 227. The very purpose for which the OAL was established was to foster a perception of objectivity and impartiality in an agency adjudication. Unemployed-Employed Council of N.J. v. Horn, 85 N.J. 646, 650, 428 A.2d 1305 (1981). That did not occur here nor will it be the case if the informal procedures contemplated in the Manual are the only method of challenging a finding of substantiated abuse.
Turning to the third-prong of Mathews, it is without question that the government has a significant interest in keeping child abusers out of the ranks of child care workers. In re Allegations of Physical Abuse at Blackacre Academy, 304 N.J.Super. *348 168, 185, 698 A.2d 1275 (App.Div.1997). However, it has or should have an equal interest in not stigmatizing the innocent and foreclosing them from employment and other opportunities. We see no government interest which will be impaired by a trial type process which subjects the allegations made to rigorous testing.
In terms of cost to the government, a trial type proceeding will plainly be more expensive and time consuming than what is presently in place and, while the number of such hearings is unpredictable, we presume it will not be insubstantial. Thus, the question of the preservation of scarce governmental resources emerges. However, financial cost alone cannot control. Mathews v. Eldridge, supra, 424 U.S. at 348, 96 S.Ct. at 909, 47 L.Ed.2d at 41. If a trial type hearing is the only viable method of testing the truth, then its cost must be borne by the public in a constitutionally governed society. That is the case here. Where an accused challenges the truthfulness of her accusers and contends, as a matter of fact, that the charge against her is false, she must be allowed, as a function of due process, in addition to fair notice, to be present, to adduce evidence, to be represented by counsel, to confront the witnesses against her and to receive a written decision. Nicoletta, supra, 77 N.J. at 167, 390 A.2d 90. In short, a trial type proceeding is the process which was due here not only out of fairness to Mrs. Spencer but as a concomitant of effective judicial review.[6]
We note that another panel of this court has recently reached the same conclusion. NJDYFS v. M.R., 314 N.J.Super. 390, 715 A.2d 308 (App.Div.1998). While, unlike us, the members of that panel could not reach an accord on the rationale for ordering a trial type hearing in a case such as this, all three recognized that a substantial liberty interest is implicated by inclusion in the Central Registry and two of the three members of the panel explicitly identified constitutional grounds as a basis for such a hearing. Id. at 423, 715 A.2d 308 (Skillman and Eichen, concurring).

III
This brings us to the question of what kind of a hearing should be held under the odd complex of facts before us. Recall that Mrs. Spencer already had a full trial type hearing in the Department of Education and was cleared of all the charges against her. Based on that hearing she sought to preclude DYFS from maintaining her name in the Central Registry. We specifically addressed such circumstances in Blackacre Academy where we noted that we "assume[d] that if the Department [of Education] conducts a hearing and renders a final decision based on a complete record, the IAIU would reevaluate its findings of abuse and, if appropriate, remove appellant's names from the Central Registry based on that decision." Blackacre Academy, supra, 304 N.J.Super. at 189, 698 A.2d 1275. Thus, if DYFS had before it the same evidence as was considered by the ALJ at the tenure hearing, we would likely have bound it to the tenure result based upon principles of administrative comity and fairness to Mrs. Spencer.
However, as DYFS points out in its brief, in reaching its conclusion it relied on much evidence which, for some reason, was not produced at the tenure hearing (for example, the testimony of Richard Carlson, a tape recorded conversation between Mrs. Spencer and Arthur Edwards and the testimony of the school administrators). Mrs. Spencer argues that DYFS should nonetheless be bound by the outcome of the tenure hearing based on the concept of "judicial estoppel" because it requested us to stay this *349 appeal pending the outcome of the tenure case which it claimed "might" moot the issue here. Mrs. Spencer views this as an acknowledgement of the preclusive effect of the tenure hearing and characterizes DYFS's present stance as a change in its prior position. Not so. We see it only as a recognition that if the tenure charges had been sustained, DYFS's conclusion that the sexual abuse charges against Mrs. Spencer had been substantiated would be unassailable. It was not a concomitant concession that if the tenure charges were dismissed on less evidence than DYFS possessed, that agency would be barred from maintaining its earlier finding of substantiated abuse. In sum, we disagree with Mrs. Spencer that the outcome of the tenure case disposes of this case as well. Because DYFS possesses evidence which the East Park School Board was unable or unwilling to produce during the tenure case, there is no warrant for application of a doctrine of preclusion.
Obviously, the better course would have been for DYFS to seek to participate in the tenure matter to assure that its interests were protected. See N.J.A.C. 6:24-1.7; N.J.A.C. 1:1-16.1 to -16.6. Having failed to do so, we see no reason why Mrs. Spencer should be required at this point to undergo the rigors of a totally new hearing including all of the discredited witnesses against her. The most economical and just disposition of this case demands that it be sent back to the ALJ who presided over the tenure charges. DYFS can present any additional evidence it has to support the charges against Mrs. Spencer and she, in turn, may challenge the evidence, cross-examine witnesses and present evidence of her own on the subject. Thereafter, the ALJ may recommend to DYFS whether the allegations of substantiated abuse against Mrs. Spencer should remain in the Central Registry based upon a preponderance of the evidence standard. N.J.S.A. 52:14B-10(c). In re Polk, 90 N.J. 550, 560-61, 449 A.2d 7 (1982).
Reversed and remanded for proceedings consonant with this opinion.
NOTES
[1] For this opinion, it is necessary to use fictitious names for the high school, the teachers, and other witnesses. See N.J.S.A. 9:6-8.10a which provides that "[a]ll records of child abuse reports..., all information obtained by the Division of Youth and Family Services in investigating such reports ..., and all reports of findings forwarded to the central registry ... shall be kept confidential," and N.J.S.A. 9:6-8.10a(b), which provides in pertinent part that "[a]ny ... court ... which receives from the division the records and reports referred to in subsection a., shall keep such records and reports, or parts thereof, confidential." See also, In re Allegations of Physical Abuse At Blackacre Academy, 304 N.J.Super. 168, 698 A.2d 1275 (App.Div.1997).
[2] Pursuant to N.J.S.A. 9:6-8.40a, which became effective April 7, 1997, when allegations are determined to be unfounded, expungement of the information is required.
[3] These include parents, other caretakers and the victim. See Blackacre Academy, supra, 304 N.J.Super. 168, 698 A.2d 1275.
[4] (1) If risk of re-offense is low, law enforcement agencies likely to encounter the person registered shall be notified;

(2) If risk of re-offense is moderate, organizations in the community including schools, religious and youth organizations shall be notified in accordance with the Attorney General's Guidelines, in addition to the notice required by paragraph (1) of this subsection;
(3) If risk of re-offense is high, the public shall be notified through means in accordance with the Attorney General's Guidelines designed to reach members of the public likely to encounter the person registered, in addition to the notice required by paragraphs (l) and (2) of this subsection.
[N.J.S.A. 2C:7-8c.]
[5] Doe also held the doctrine of fundamental fairness to be a separate basis for such a hearing. 142 N.J. at 107-09, 662 A.2d 367.
[6] Despite DYFS's arguments to the contrary, nothing in Blackacre Academy, supra, suggests a different result. There we were faced with a challenge to a substantiated abuse finding by DYFS in which appellants did not argue that DYFS should have held an evidentiary hearing and did not seek a remand for a hearing. Moreover, that case arose prior to the enactment of the New Jersey statute requiring child care employers seeking licensure to resort to the Central Registry. Valmonte was distinguished in Blackacre Academy by the absence of such a statute. Further, we specifically contemplated that an aggrieved party who suffered adverse consequences by virtue of disclosure of the Central Registry information would receive due process by way of a trial type hearing in the agency which proposed to use the information against him or her.