> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is only binding on the
> parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3010-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TERRI M. GROSS,

    Defendant-Appellant.

_____

        Submitted September 27, 2016 — Decided September 15, 2017

        Before Judges Messano and Espinosa.

        On appeal from Superior Court of New Jersey,
        Law Division, Salem County, Indictment No. 13-
        09-0524.

        Law Office of Christian A. Pemberton, P.C.,
        attorneys for appellant (Roland G. Hardy, Jr.,
        on the brief).

        Christopher S. Porrino, Attorney General,
        attorney for respondent (Joseph A. Glyn,
        Deputy Attorney General, of counsel and on the
        brief).

PER CURIAM

    Defendant Terri Gross appeals from her convictions for the

unlawful release of confidential Division of Youth and Family

Services (DYFS or the Division)[1] records, N.J.S.A. 9:6-8.10(b), a fourth-degree offense, and the disorderly persons offense of obstructing the administration of law, N.J.S.A. 2C:29-1. For the reasons that follow, we reverse her convictions and remand for further proceedings on her conviction for the unlawful release of DYFS records.

I.

Defendant was employed by the Salem City Police Department (SCPD) as a clerk-typist. In addition to her other duties, she was responsible for the filing of substantiated findings of child abuse sent to the SCPD by DYFS and the maintenance of SCPD prisoner logs. In May 2012, she gave copies of confidential DYFS documents to Mayor Robert Davis regarding a person challenging him in a primary election.

The report at issue, a "[DYFS] Report of Substantiated Abuse/Neglect to Law Enforcement Agencies" (DYFS Report) consisted of a cover letter and a one-page form. The cover letter stated the "enclosed is information regarding children who reside within your jurisdiction who were found to have been abused or neglected."

---

[1] On June 29, 2012, the Governor signed into law A-3101, which reorganized the Department of Children and Families, renaming DYFS as the Division of Child Protection and Permanency. L., 2012, c. 16, eff. July 2, 2012. Because the events here occurred before the effective date and references in the record are to DYFS, we use that name throughout.

In bold print, the letter stated, "Information provided by the Division must be kept confidential by local and state police and other law enforcement agencies in accordance with the law."

The word "CONFIDENTIAL" appeared at the top center of the form. The form provided the full name, age and address of the child and the name and address of the "perpetrator." The form detailed that the child had suffered "abuse" and "sexual abuse," provided the dates of referral and investigation completion, and stated: the case had been referred to the county prosecutor; DYFS had "accepted this case for supervision"; and there had been prior abuse/neglect referrals. The form also included a "statement of conclusion" describing the abuse.

N.J.S.A. 9:6-8.10a(a) addresses the limited circumstances in which the Department of Children and Families (DCF) may release confidential DYFS records and states, in pertinent part:

> All records of child abuse reports made pursuant to [N.J.S.A. 9:6-8.10], all information obtained by the Department of Children and Families in investigating such reports including reports received pursuant to [N.J.S.A. 9:6-8.40], and all reports of findings forwarded to the child abuse registry pursuant to [N.J.S.A. 9:6-8.11] shall be kept confidential and may be disclosed only under the circumstances expressly authorized under subsections b., c., d., e., f., and g. herein. The department shall disclose information only as authorized under subsections b., c., d., e., f., and g. of this section that is relevant to the purpose for which the information is

required, provided, however, that nothing may be disclosed which would likely endanger the life, safety, or physical or emotional well-being of a child or the life or safety of any other person or which may compromise the integrity of a department investigation or a civil or criminal investigation or judicial proceeding.

Nothing in [N.J.S.A. 9:6-8.10a et seq.] shall be construed to permit the disclosure of any information deemed confidential by federal or State law.

[(Emphasis added).]

N.J.S.A. 9:6-8.10a(e) authorizes DCF to forward such confidential documents to police in the jurisdiction where the abused child resides and mandates, "The police or law enforcement agency shall keep such information confidential."

It is undisputed that the SCPD received the DYFS Report pursuant to N.J.S.A. 9:6-8.10a(e), and that defendant released documents covered by N.J.S.A. 9:6-8.10a(a) to the mayor.

N.J.S.A. 9:6-8.10b states: "Any person who willfully permits or encourages the release of the contents of any record or report in contravention of this act shall be guilty of a misdemeanor and subject to a fine of not more than $ 1,000.00, or to imprisonment for not more than 3 years, or both."

II.

On June 14, 2012, Chief of Police John Pelura, III, learned that a two-page DYFS Report and a page from the April 2003 prisoner

4

log had been mailed to the Salem County Democratic Party treasurer and members of the public. He contacted the Salem County Prosecutor's Office (SCPO) and initiated an investigation.

Pelura testified that, as Chief of Police, he was the top of the chain of command for the department. He stated unequivocally, "[n]othing . . . should be disseminated without [his] authorization." He was "very concerned" that confidential records had been released from his department. Pelura acknowledged he might authorize release of the prisoner log but "wouldn't authorize the dissemination of this DYFS log" because it "contain[ed] information of — of a child. Her age, her date of birth, and her address; and, that information would never — would never be released."

Pelura began searching the police station to locate the DYFS Report and the 2003 prisoner log. The DYFS Report was located in the filing cabinet in the Detectives' office, its proper storage place, but the prisoner log was not in its usual location. On June 15, 2012, Pelura looked again for the prisoner log and discovered it in defendant's office in a banker's box filled with case files on top of a file cabinet. Upon opening the binder, Pelura found the reproduced page of the prisoner log at the very back of the binder, out of chronological order with the remaining entries.

Following this discovery, Pelura positioned one of the closed-circuit cameras on the second floor to point at the stairwell and defendant's office door. When defendant returned from vacation on July 11, 2012, Pelura asked her to retrieve the prisoner logs for the past ten years, which included the 2003 prisoner log, to ascertain whether she knew where it was located. Sergeant Fred Parkell, an investigator from the SCPO assigned to the investigation, observed defendant's movements on the camera feed in Pelura's office. Pelura and defendant looked "in the main area of the [police department], on the second floor of that common area," finding several other prisoner logs, and then went downstairs into the booking room. Defendant then suggested Pelura "go in the basement to see if they were down there, while she went back up to the second floor to do that." The closed-circuit camera recorded defendant returning to the second floor and entering her office; she retrieved the binder and gave it to Pelura.

On the following day, Parkell and another SCPO investigator interviewed defendant. Parkell advised defendant that documents maintained at the SCPD were being mailed to residents and asked if she could identify some documents. Defendant replied she did not know what he was talking about, that she had just returned to work after a month and had nothing to do with it. Parkell showed her a prisoner log for April 19, 2003, a DYFS referral letter to

the Chief of Police and a DYFS Confidential Report of Substantiated Abuse. She was asked several times if anyone inside or outside the police department had asked her for copies of the documents. Repeatedly, she denied making copies or that anyone had asked her to do so.

On July 19, 2012, Parkell took a sworn statement from defendant at the SCPO in the presence of her lawyer. Defendant stated she had given erroneous answers in the first interview because she "was getting confused."

Defendant explained that Davis called her in "[a]pproximately . . . May 2012," between 6:00 p.m. and 7:30 p.m. on her office line, and requested the "[a]rrest [l]og" and "DYFS forms" relating to his primary challenger because he worked "around children." Davis informed defendant he was going to "have a special meeting" and "needed a copy of those documents." Defendant said she knew Davis "all [her] life," but did not consider him a friend.[2]

After she told him the records were privileged and could not be provided to him, Davis responded that he was "the mayor and [was] entitled to these documents and . . . everyone that works

---

[2] Chief Pelura testified, however, that on an occasion in 2012 he had observed defendant pull her car up in front of Davis's and get into his Mercedes SUV.

down [t]here at the police department works for [him]." Davis told defendant the City Solicitor, David Puma, "had a letter that was in place that [Davis] was entitled to receive privileged information." Although Davis did not threaten to get defendant fired, defendant "felt threatened and [] knew that he was over the police department."[3]

Following the phone call, defendant retrieved the documents and "made a copy." She did not tell anyone what she was doing. After calling a second time to confirm defendant retrieved the documents, Davis drove to the police department. Defendant walked out and handed him the documents. Approximately one hour had elapsed between the time Davis called and her delivery of the documents to him. Defendant stated that, at the time she gave Davis the documents, she believed she had done nothing wrong because Davis was her "boss and head of the police department."

At trial, defendant gave an account consistent with her July 19 statement. She said, although the normal work hours for the clerical staff were 8:30 a.m. to 4:30 p.m, it was not uncommon for her to stay at work after hours to do homework. When Davis called her in May 2012, between the hours of 6:30 and 8:00 p.m., he asked

---

[3] Defendant subpoenaed Davis to testify at trial. He asserted his Fifth Amendment privilege against self-incrimination and did not testify.

A-3010-14T3

her to "search for arrest logs and DYFS records, any information on [his primary challenger]." She "told the mayor that those documents were confidential and that he wasn't allowed to receive those documents." She obtained the records he requested because she felt threatened that she would lose her job and also believed she was able to release them to him because he was her boss.

David Puma, the Solicitor for the City, testified Davis never asked him for the release of a DYFS substantiation document or for such an authorization. He testified further that, if asked, he would have counseled that the documents are confidential and cannot be released, "even to other City officials, except on a need to know basis."

The jury convicted defendant as charged on the fourth-degree revealing DYFS records charge, acquitted her on a fourth-degree charge of obstructing the administration of law and convicted her on the lesser included offense of disorderly persons obstructing the administration of law. The trial judge sentenced her to concurrent one-year terms of probation.

In her appeal, defendant presents the following arguments for our consideration:

> POINT I
>
> DEFENDANT IS ENTITLED TO JUDGMENT OF ACQUITTAL BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT

THAT THE DEFENDANT RELEASED CONFIDENTIAL INFORMATION IN CONTRAVENTION OF N.J.S.A. 9:6-8.10b.

    A.    SALEM CITY MUNICIPAL CODE IDENTIFIES THE MAYOR AS THE HEAD OF THE POLICE DEPARTMENT AND APPROPRIATE AUTHORITY OVER THE POLICE DEPARTMENT WITH DIRECT RESPONSIBILITY AND AUTHORITY WITHIN THE POLICE DEPARTMENT.

    B.    RELEASE OF CONFIDENTIAL REPORT OF SUBSTANTIATED ABUSE/NEGLECT TO THE MAYOR WAS PERMITTED UNDER N.J.S.A. 9:6-8.10a(1)(b)(13) AND (20) (PARTIALLY RAISED BELOW).

    C.    THE STATE FAILED TO PROVE THE REQUISITE STATE OF MIND TO PURPOSELY CONTRAVENE THE STATUTE (NOT RAISED BELOW).

POINT II

JURY INSTRUCTION AS TO ELEMENTS OF N.J.S.A. 9:6-8.10a VIOLATION WAS ERRONEOUS AND CONSTITUTES PLAIN ERROR (NOT RAISED BELOW).

POINT III

THE FAILURE TO INSTRUCT THE JURY THAT IF IT FOUND DEFENDANT'S BELIEF THAT SHE WAS AUTHORIZED TO DISCLOSE THE CONFIDENTIAL REPORT TO THE MAYOR TO BE AN HONEST ONE, EVEN THOUGH UNREASONABLE, IT COULD FIND THAT SHE LACKED THE REQUISITE STATE OF MIND REQUIRES REVERSAL (NOT RAISED BELOW).

<u>POINT IV</u>

THE FAILURE TO INSTRUCT THE JURY ON JUSTIFICATION AS A DEFENSE IS PLAIN ERROR (NOT RAISED BELOW).

    A. DEFENDANT PRESENTED SUFFICIENT FACTS TO WARRANT A JURY CHARGE WITH RESPECT TO JUSTIFICATION AS DEFENSE.

<u>POINT V</u>

DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED.

    A. STATE FAILED TO PROVE THAT DEFENDANT COMMITTED AN UNLAWFUL ACT AS DEFINED BY <u>N.J.S.A.</u> 2C:29-1(a) (NOT RAISED BELOW).

    B. DEFENDANT'S CONVICTION FOR OBSTRUCTING THE ADMINISTRATION OF LAW WAS AGAINST THE WEIGHT OF THE EVIDENCE.

The issues presented are questions of law, which we review de novo. <u>State v. Mann</u>, 203 <u>N.J.</u> 328, 337 (2010).

Defendant's argument that the trial court committed plain error in failing to instruct the jury on the "claim of right" defense (Point IV) lacks any merit. This defense is "an affirmative defense to prosecution for theft," <u>N.J.S.A.</u> 2C:20-2(c)(2), and has no application here. <u>See State v. Saavedra</u>, 222 <u>N.J.</u> 39, 47 (2015) (noting that "claim of right" is "a form of justification in prosecutions for theft").

Because we conclude the absence of a charge on mistake of law had the clear capacity to bring about an unjust result, we reverse defendant's conviction on N.J.S.A. 9:6-8.10b and need not address the sufficiency of the State's proofs (Point I.C). For guidance on remand, we address the legal question regarding the mayor's status as the head of the police department. We also conclude that defendant's conviction for obstruction of justice cannot stand as a matter of law.

### III.

In Point I, defendant argues her conviction must be reversed because the trial court erred as a matter of law in ruling that her release of the documents to the mayor was not sanctioned by Title Nine. She presents three separate contentions to support this argument. We conclude the first two of these contentions lack merit: (1) there was no unlawful disclosure because the mayor is identified as the head of the police department by the Salem City municipal code, and (2) release of the documents to the mayor was explicitly permitted by N.J.S.A. 9:6-8.10a(b)(13) and (20). Defendant also argues the State's failure to prove she purposely acted in contravention of the Act constituted plain error, an issue we discuss in conjunction with her argument that the trial court committed plain error in the jury instruction regarding the elements of N.J.S.A. 9:6-8.10a (Point II).

12

The issue regarding the mayor's status under the municipal code and the application of N.J.S.A. 9:6-8.10a(20) arose during defense counsel's cross-examination of Parkell. Counsel stated it was his intention to make this argument as part of a motion for dismissal at the end of the State's case. The trial court elected to address the legal issue as whether disclosure was authorized to the mayor under the statute because it had an impact on the permissible scope of cross-examination. Defense counsel did not object to this procedure and renewed his argument in the form of a motion to dismiss count one at the end of the State's case.

Defense counsel conceded, "obviously, [] the mayor is not a police officer." Nonetheless, he argued disclosure was authorized by N.J.S.A. 9:6-8.10a(b)(20), which authorizes DCF to release confidential documents to "[a] federal, State, or local government entity, to the extent necessary for such entity to carry out its responsibilities under law to protect children from abuse and neglect." Citing the municipal code, counsel argued the mayor had the requisite status as the head of the police department and wanted the documents for a sanctioned purpose because of concerns that were raised regarding his primary challenger's work at a children's facility. The assistant prosecutor argued that, pursuant to N.J.S.A. 40A:61-4f, the mayor did not have the authority to conduct law enforcement duties and responsibilities.

13

The trial court concluded disclosure of the documents to the mayor was not authorized by Title Nine.

## A.

Defendant argues that disclosure to the mayor was authorized by subsections (13)[4] and (20) of N.J.S.A. 9:6-8.10a(b). That statute provides no support for the disclosure here, however.

Subsection (b) of N.J.S.A. 9:6-8.10a sets forth the limited exceptions in which DCF may release confidential records upon written request to enumerated persons and entities for specific purposes.[5] We have repeatedly acknowledged the threshold requirement of a written request for disclosure by DCF under the statute. See, e.g., N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 637 (App. Div. 2010); In re East Park High School, 314 N.J. Super. 149, 156-59 (App. Div. 1998); N.J. Div. of Youth & Family Servs. v. M.R., 314 N.J. Super. 390, 399-402 (App. Div. 1998).

Because there was no written request to DCF and the release was made by defendant, the statute provides no authorization for defendant's release of the documents to Davis. Once the documents

_____

[4] Defendant relies on this subsection for the first time on appeal.

[5] N.J.S.A. 9:6-8.10a was amended, effective July 31, 1997 (L. 1997, c. 175, § 16), to require a written request for information before DCF can disclose confidential records.

were released to SCPD pursuant to N.J.S.A. 9:6-8.10a(e), the statutory requirement was to maintain their confidentiality. N.J.S.A. 9:6-8.10a(e) provides no exceptions for the release of these confidential records by the police department.

Even if the statute could be considered an appropriate reference to provide guidance for the disclosure of the confidential records, none of the limited exceptions for release apply here.[6]   N.J.S.A. 9:6-8.10a(b) (13) and (20) permit the department to release documents, upon written request, to:

> (13) Any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual employed by or seeking employment with an agency or organization providing services to children;
>
>    . . . .
>
> (20) A federal, State, or local government entity, to the extent necessary for such entity to carry out its responsibilities under law to protect children from abuse and neglect;
>
> [(Emphasis added).]

---

[6]  Notably, although defendant argues the release of documents to Davis was permissible given his status as the head of the police department, she does not rely upon N.J.S.A. 9:6-8.10a(b)(2), which authorizes release to "[a] police or other law enforcement agency authorized to investigate a report of child abuse or neglect."

Subsection (13) is plainly inapplicable because Davis was neither conducting a background check nor "mandated by statute to consider child abuse or neglect information" in doing so. Subsection (20) is similarly unavailing because the mayor had no "responsibilities under law" to protect children from abuse and neglect.

Finally, because the interpretation of N.J.S.A. 9:6-8.10a(b) urged by defendant is clearly erroneous, the trial court did not commit plain error by failing to sua sponte charge the jury on an erroneous theory of law as argued in Point II.

B.

Defendant also argues the mayor was entitled to receive the documents as a matter of law because he was the head of the police department. In essence, the premise for this argument is that the delivery of the documents to Davis was not a release at all, but an internal sharing of confidential documents within the mandate, "the police and law enforcement agency shall keep such information confidential." N.J.S.A. 9:6-8.10a(e).

At first blush, there is support for defendant's argument in the City of Salem's municipal code and, by reference, N.J.S.A. 40A:61-4(f). City of Salem, N.J., Code § 50-4, "Powers and duties of Mayor," states, "[t]he Mayor shall, pursuant to N.J.S.A. 40A:61-

4, be the head of the Police Department and shall have the power to appoint, suspend or remove all employees of the Department."

But, this statement cannot be viewed in isolation. See Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 195 (2010) (noting that, in construing a statute, "the intention of the Legislature is to be derived from a view of the entire statute and that all sections must be read together in light of the general intent of the act.")

N.J.S.A. 40A:14-118 states in pertinent part:

> The governing body of any municipality, by ordinance, may create and establish . . . a police force . . . and provide for the maintenance, regulation and control thereof. Any such ordinance shall . . . provide for a line of authority relating to the police function . . . . The ordinance may provide for the appointment of a chief of police . . . and the prescription of [his] powers, functions and duties, all as the governing body shall deem necessary for the effective government of the force. Any such ordinance . . . shall provide that the chief of police . . . shall be the head of the police force and that he shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof, and that he shall, pursuant to policies established by the appropriate authority:
>
> a. Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;

b. Have, exercise, and discharge the functions, powers and duties of the force;

c. Prescribe the duties and assignments of all subordinates and other personnel;

d. Delegate such of his authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and

e. Report at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month, and make such other reports as may be requested by such authority.

The statute provides that the "appropriate authority" is established by ordinance and may be the mayor, the governing body, "any designated committee or member thereof, or any municipal board or commission established by ordinance for such purposes" Ibid. The statute also directs, "Nothing herein contained shall prevent the appropriate authority from examining at any time the operations of the police force or the performance of any officer or member thereof." Ibid.

The "Powers of the Mayor" are set forth in the municipal code (City of Salem, N.J., Code § 3.2) and N.J.S.A. 40A-61-4 in identical language:

A. The Mayor is the chief executive officer of the city.

. . . .

F. The Mayor shall be the head of the Police Department and shall have the power to appoint, suspend or remove all employees of the Police Department. He/She shall appoint the Chief of Police and such captains and sergeants as may be authorized by the ordinance, with the advice and consent of the Council. He/She shall control and direct the police force of the city, and he/she may appoint such special policemen as he/she may deem necessary for the preservation of public order. He/She shall enforce the laws of the state and the ordinances of the city.

Chapter 50 of the City of Salem Code establishes the Police Department. Section 50-3 states, in pertinent part,

The Police Department shall consist of the following members, employees and personnel in order of rank:

(1) A Chief of Police.
. . . .

The mayor is not included among the persons who compose the police department and is mentioned in Section 50-3 only regarding his authority to appoint all members of the department "subject to the provisions of Title 40A and Title 11."

Section 50-5 identifies the role of the Chief of Police:

The <u>Chief of Police shall head the Department</u> under the Mayor and pursuant to <u>N.J.S.A.</u> 40A-118 <u>shall be directly responsible</u> to the Mayor as the appropriate authority <u>for the efficiency and routine day-to-day operations</u> thereof and shall, pursuant to policies established by the appropriate authority:

A. Administer and enforce rules and regulations and special

19                                          A-3010-14T3

emergency directives for the disposition and discipline of the Police Department and its officers and personnel.

B. Have exercise and discharge the functions, powers and duties of the force.

C. Prescribe the duties and assignments of all subordinates and other personnel.

D. Delegate such of his authority as he may deem necessary for the efficient operation of the Police Department to be exercised under his direction and supervision.

E. Report at least monthly to the Mayor as the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month and make such other reports as may be requested by such authority. A copy of any and all such reports shall be provided to the Chairman of the committee.[7]

[(Emphasis added).]

Reading these statutes together, the mayor has the authority to exercise an executive role, setting policy for the police department. In contrast, the Chief of Police is explicitly charged with the day to day operations of the department. The chain of

---

[7] Pursuant to Section 50-2, the City Council appoints a committee to oversee the Police Department, which committee "act[s] as the coordinator between the Council, the mayor and the Department."

command for the police department establishes the chief of police as the person in command; the mayor is not even included in the chain of command. In our view, the obligation to maintain the confidentiality of the DYFS records falls within the day to day operations of the police department and not within the mayor's role in setting policy. Indeed, the mayor lacks any authority to create a policy regarding the confidentiality of these records that differs from that established by the Legislature.

We note further that the mayor's purported reason for obtaining the confidential records did not square with either his role in setting policy for the department or the department's obligation to maintain the confidentiality of the records. According to defendant, the mayor said concerns had been expressed regarding his primary challenger's association with a facility that provided services to children, that he wanted to hold a meeting with council members on this issue and wanted the confidential records for that purpose. This would be an obvious breach of confidentiality. Any effort to justify such activity by claiming it fell within the penumbra of the exceptions applicable to disclosure by DCF under N.J.S.A. 9:6-8.10a(b) is unavailing.

We therefore conclude the mayor was not entitled to receive the confidential DYFS records because of his relationship to the police department under the circumstances here.

## IV.

N.J.S.A. 9:6-8.10b makes it an offense to "willfully permit[] or encourage[] the release of [confidential DYFS records] in contravention of this act." In Points I.C and III, defendant presents two arguments as plain error. R. 2:10-2. In Point I.C., defendant challenges the sufficiency of the proof to establish she acted willfully "in contravention of the act." In Point III, defendant argues it was plain error for the trial court to fail, sua sponte, to instruct the jury that if defendant believed she was authorized to disclose the DYFS report to Davis, the jury could find she lacked the requisite state of mind to be found guilty. Because we conclude the absence of a charge on mistake of law had the clear capacity to bring about an unjust result, we reverse defendant's conviction and need not address the sufficiency of the State's proofs.

Defendant did not object to the charge or ask for Model Jury Charge (Criminal), "Ignorance or Mistake, (N.J.S.A. 2C:2-4)" (2007). The State counters her plain error argument, stating, "[d]efendant's purpose in releasing the report is not an element

22

of the offense, and her supposed belief that she was permitted to release it is irrelevant."

Aside from requiring that an actor "willfully" release the protected documents, N.J.S.A. 9:6-8.10b does not specify a culpability requirement. As a result, N.J.S.A. 2C:2-2(c)(3) requires the crime defined by the statute must be construed as incorporating "knowingly," N.J.S.A. 2C:2-2(b)(2), as its culpability requirement.

> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. . . . "Knowing," "with knowledge" or equivalent terms have the same meaning.
>
> [Ibid. ]

Therefore, the State was required to prove defendant gave the protected documents to the mayor, knowing that doing so was in contravention of the statute. See N.J.S.A. 2C:2-2(c)(1)(providing culpability requirement applies to all material elements of an offense).

"[M]istake as to a matter of . . . law is a defense if the defendant reasonably arrived at the conclusion underlying the mistake and . . . [i]t negatives the culpable mental state

required to establish the offense." <u>N.J.S.A.</u> 2C:2-4(a)(1).[8] "The mistakes of law . . . do not involve errors over whether actions are criminal; they are mistakes concerning legal issues that are relevant to proof of the elements of an offense." <u>State v. Wickliff</u>, 378 <u>N.J. Super.</u> 328, 335 (App. Div. 2005).

The mistake of law at issue here is whether defendant knew the release of documents <u>to the mayor</u> was in contravention of the law. As the trial court observed, "if a sergeant or a lieutenant or the chief had come to [defendant] and said, I need a copy of [the confidential records], . . . [h]er giving that document to them would not . . . as a matter of law, be a violation of the statute . . . ."

There was evidence here to support the conclusion that defendant was fully aware her release of the DYFS records to the mayor contravened the statute. Her admitted initial response to the request was that the mayor was not permitted to receive the documents. The circumstances of the delivery — at night and outside the police department — are highly irregular. She advised no one in the police department of the request or her compliance. Her denials regarding the release of the documents and any

---

[8] The Supreme Court has stated that this basis for attacking the State's proofs regarding a requisite state of mind is not limited to a mistaken belief that is "reasonably arrived at." <u>State v. Pena</u>, 178 <u>N.J.</u> 297, 315-19 (2004).

knowledge regarding their release in the first interview are consistent with a consciousness of guilt.

The thrust of the defense was that, although defendant was aware of the requirement to maintain the confidentiality of the records, she believed the release to Davis was authorized because he was the head of the police department. This theme was presented in defendant's testimony, the statement she gave in the presence of her attorney and in defense counsel's argument to the jury.

> It is a defendant's responsibility to come forward with "some evidence" in order to support a theory of mistake. However, because mistake negates the culpable mental state, once the defense is presented, the State bears the burden of disproving it beyond a reasonable doubt.
>
> [State v. Cross, 330 N.J. Super. 516, 523 (App. Div. 2000) (citations omitted).]

Defendant's testimony satisfied her burden to present some evidence that she acted under a mistake of law that negated the culpable mental state. See State v. Pena, 178 N.J. 297, 307-13 (2004); State v. Sexton, 160 N.J. 93 (1999).

The trial court charged the jury as to the elements of the offense and that the State had to prove each element, including that defendant acted purposely, beyond a reasonable doubt. But, as we have noted, the culpability requirement applicable to this offense was "knowingly," which was not charged to the jury. And,

given the defense presented by defendant, it was also necessary to instruct the jury that, if it found defendant held the mistaken belief that the release of the documents was not in contravention of the law, she "could not have acted with the state of mind that the State is required to prove beyond a reasonable doubt." Model Jury Charge (Criminal), "Ignorance or Mistake," supra.

When a defendant fails to challenge jury instructions at the time of trial, "it may be presumed that the instructions were adequate." State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div.) (citing R. 1:7-2), certif. denied, 177 N.J. 572 (2003). For a jury instruction to rise to the level of plain error, the alleged error must so substantially affect the rights of the defendant as to "convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (quoting State v. Adams, 194 N.J. 186, 207 (2008)). In ascertaining the prejudicial effect of a jury charge, this court must evaluate the charge "in light of the totality of the circumstances — including all the instructions to the jury, [and] the arguments of counsel." Adams, supra, 194 N.J. at 207 (citation omitted) (emphasis added).

If the jury accepted defendant's testimony that she believed a release of the documents to the mayor was not in contravention of the statute, there were grounds for an acquittal. Defendant

presented sufficient evidence to trigger the State's burden to prove her knowledge beyond a reasonable doubt. Because the mistake of law was adequately presented, we conclude the omission of an instruction on the legal significance of a mistake of law had the clear capacity to bring about an unjust result, R. 2:10-2, which was exacerbated by the failure to charge the jury on "knowingly," and requires the reversal of defendant's conviction.

## V.

In Point V, defendant argues the trial court should have granted her motion for judgment of acquittal on the obstruction charge at the end of the State's case. We agree with the trial court that there was sufficient evidence to present that charge to the jury. State v. Reyes, 50 N.J. 454, 458-59 (1967). However, defendant also argues, as plain error, R. 2:10-2, that the State failed to prove she committed an unlawful act as defined by N.J.S.A. 2C:29-1(a). In light of the jury verdict, we conclude this argument has merit, requiring the reversal of her conviction.

The jury acquitted defendant of fourth-degree obstruction of justice, N.J.S.A. 2C:29-1, and convicted her of the disorderly persons offense under that statute.

N.J.S.A. 2C:29-1 provides:

> a. A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental

function or prevents or attempts to prevent a public servant from lawfully performing an official function <u>by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act</u>. . . .

b. An offense under this section is a crime of the fourth degree <u>if the actor obstructs the detection or investigation of a crime or the prosecution of a person for a crime</u>, otherwise it is a disorderly persons offense.

To prove obstruction beyond a reasonable doubt, the State must proffer evidence to satisfy three elements: (1) "that the defendant . . . committed an unlawful act"; (2) "that the act was committed for the purpose of . . . obstructing, impairing or perverting the administration of law or other governmental function"; and (3) "that in committing the act, the defendant did [OR attempted to] . . . obstruct, impair or pervert the administration of law or other governmental function." <u>Model Jury Instruction (Criminal)</u>, "Obstructing Administration of Law or Other Governmental Function (<u>N.J.S.A.</u> 2C:29-1)" (2000).

The State's theory was that defendant committed "an independently unlawful act," a violation of <u>N.J.S.A.</u> 2C:29-3(b)(4), which provides: "A person commits an offense if, <u>with the purpose to hinder his own detection, apprehension, investigation, prosecution, conviction or punishment for an offense</u> . . . , he: (4) Gives false information to a law enforcement officer."

(Emphasis added). We agree that such a violation would constitute an independently unlawful act.

However, it is an ineluctable conclusion that, in acquitting defendant of the fourth-degree offense, the jury found defendant did not "obstruct[] the detection or investigation of a crime or the prosecution of a person for a crime." There was no evidence of any other predicate act, i.e., "flight, intimidation, force, violence, or physical interference or obstacle," to support a conviction under this statute. Therefore, the jury verdict does not support a conviction on this count.

In sum, we reverse defendant's conviction on the first count, remand for further proceedings consistent with this opinion and do not retain jurisdiction. We reverse defendant's conviction for obstruction of justice. Any argument raised by defendant not explicitly addressed in this opinion lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3010-14T3